EMMA L. WATERS *et al.*

*v.*

OLIVER P. WATERS *et al.*

*Opinion filed June 14, 1906.*

1. WILLS—*unequal division of property does not show undue influence.* An unequal division of property among the children of the testatrix does not, of itself, show undue influence on the part of those favored in the distribution.

2. SAME—*contestants have the burden of proving their charges.* The certificate of the oaths of the subscribing witnesses to a will is *prima facie* proof of the validity of the will in a proceeding in equity to contest the will on the ground of undue influence and want of testamentary capacity, and the complainants have the burden of overcoming the *prima facie* case so made, by substantiating both charges of the bill.

3. SAME—*feebleness and age do not show want of testamentary capacity.* To sustain an allegation of want of testamentary capacity something more must be shown than mere physical suffering, disease and old age on the part of the testatrix.

4. SAME—*when testamentary capacity exists.* Testamentary capacity exists if the testator, at the time of making his will, had such mind and memory as enabled him to understand the business in which he was then engaged and the effect of the disposition made by him of his property.

5. SAME—*what does not show undue influence.* Ceasing to talk to a neighbor about the will when the favored beneficiaries came into the room does not show that the mind of the testatrix was influenced by fear of such beneficiaries or that she was imposed upon by them in any way.

6. SAME—*declarations of testatrix in conflict with will are not admissible.* Declarations of the testatrix, made either before or after the execution of the will, which are in conflict with its provisions are not admissible in a proceeding to contest the will, even upon the ground of undue influence.

7. SAME—*influence acquired by affection is not undue.* Influence over the testatrix gained by affection and friendly attention to her is not regarded in the law as undue influence.

8. SAME—*testatrix is presumed to have known the contents of her will.* Where the evidence shows the testatrix executed the will, that she knew what she was doing and was in good mental condi-

tion, it will be presumed, in the absence of any evidence tending to show the contrary, that she knew the contents of her will.

9. SAME—*contestant is confined to charges made by bill.* Complainant in a bill to set aside the probate of a will will be allowed to impeach the *prima facie* case made in favor of the will by the proof given in probate only upon the particular grounds that are alleged in the bill.

APPEAL from the Circuit Court of Stephenson county; the Hon. R. S. FARRAND, Judge, presiding.

This is a bill in chancery, brought by the appellees to contest the will of their mother, Mary Waters, late of Stephenson county. The bill was filed in the circuit court of Stephenson county by the appellees, two of the children of Mary Waters, against the other three children and the executor of the estate, as defendants. The prayer of the bill is, that the will of Mary Waters, and the probate thereof, be set aside upon the alleged grounds that, at the time of the making of the will, Mary Waters was not of sound mind and memory, and that the signing of the will was procured from her by undue influence, exercised over her by her two daughters, the appellants Emma L. Waters and Lydia J. Stockberger. One of the defendants below, Carrie E. Waters, entered her appearance, but filed no answer, and default was taken against her. Answers were filed by Emma L. Waters and Lydia J. Stockberger, denying the material allegations of the bill, and an answer was also filed by the executor, Grant Byrnes. Replications were filed to the answers by the appellees, and the cause was tried before the court and a jury. The jury rendered a verdict, finding that the instrument in evidence, purporting to be the last will and testament of Mary Waters, deceased, was not her will. Motion for new trial was overruled, exception was taken, and a decree was entered in accordance with the verdict. The present appeal is prosecuted from such decree.

Mary Waters died leaving a farm in Stephenson county of about two hundred and eighty acres of land, a house and

lot in the village of Ridott, and personal property worth about $4000.00, the value of the whole estate being about $24,000.00, or $25,000.00. The deceased was the widow of Harvey Waters, who died in the spring of 1899, having resided in Ridott about twelve years, and within a mile thereof over fifty years. She left surviving her, as her children and only heirs-at-law, four daughters, and one son, to-wit, the appellants, Emma L. Waters, Lydia J. Stockberger, and Carrie E. Waters, and the appellees, Oliver P. Waters, and Clara McCracken. Emma L. Waters and Carrie E. Waters, the two unmarried daughters, lived with their mother for years before and up to the time of her death. Lydia J. Stockberger and her husband lived at Pecatonica about ten miles from Ridott. Clara McCracken, the oldest child, was about fifty-nine years of age, and had a son twenty-eight years old, who was one of the witnesses in this cause. She lived in Ridott, but seems to have visited or been with her mother very little. Oliver P. Waters lived in California at the time of his mother's death, and had been a resident of that State for some ten or twelve years prior to her death. The will of Mary Waters was admitted to probate in the county court of Stephenson county, and letters testamentary were granted by that court to Grant Byrnes, the executor named in the will, a nephew of the testatrix, his mother being her sister.

By the terms of the will, after providing for the payment of her debts, the testatrix left to her daughter, Emma L. Waters, her residence in Ridott, with lots, barns, sheds and everything belonging thereto, and all her personal property, consisting of beds, clothing, horses and cattle, and all that was in and around said residence; she left to her daughter, Carrie E. Waters, $1000.00 in money. The will provided that the farm, and all the other real estate that she might own at her demise, should be divided equally between her daughters Lydia J. Stockberger, Carrie E. Waters, and Emma L. Waters to be for all claims for services against

her estate; she left to her daughter, Clara McCracken, the sum of $5.00 for all claims and services against her estate; and to her son Oliver P. Waters, the sum of $5.00 for all claims and services against her estate; the will also provided that any moneys that were left after her just debts were paid should be divided equally between her daughters, Lydia J. Stockberger and Emma L. Waters, and she therein stated that it was her desire that the girls should not sell the farm for some time, but collect rent as their income until sold. The will was executed on August 7, 1901, at the residence of the testatrix in Ridott, and was apparently drawn by a justice of the peace and notary, living in Ridott by the name of William K. McGilligan, who has since deceased, and was properly signed by the attesting witnesses. The subscribing witnesses appeared before the county court when the will was admitted to probate, and deposed that the instrument in question was the last will of the testatrix, and that they subscribed their names thereto at the request of the testatrix, in her presence, and in the presence of each other, on August 7, 1901, and that she then and there subscribed her name thereto in their presence and declared the same to be her last will and testament; and that at the time of executing the same said testatrix was of full age, of sound mind and memory, and under no constraint.

H. C. HYDE, W. N. CRONKRITE, and R. K. WELSH, for appellants.

R. R. TIFFANY, for appellees.

Per CURIAM: *First*—The will in this case is attacked upon the two alleged grounds that the testatrix, at the time of making the will, was not of sound mind and memory, and was subject to undue influence exercised over her by her daughters, Emma L. Waters and Lydia J. Stockberger.

After a careful examination of this record and of all the testimony in it, we are obliged to conclude that a finding that

testatrix, at the time of executing the instrument in question, did not possess the requisite mental capacity to make a valid will, is against the manifest preponderance of all the evidence in this cause, and that on the other branch of the case the evidence fails to show any wrongful act on the part of the appellants, Emma L. Waters and Lydia J. Stockberger, which was calculated to unduly influence the testatrix to make the disposition of her property which she did make.

In finding their verdict in this case the jury must have been influenced by the consideration, that the testatrix left all her property to three of her children, and cut off the other two, the appellees herein, with $5.00 apiece. Under the law, however, if she was of sound mind and memory and acted as a free agent, she had a right to dispose of her property as she saw fit.

In *Freeman* v. *Easly,* 117 Ill. 317, we said (p. 322): "It accords with common observation that in contests concerning wills, where the testator has made, or has seemingly made, an unequal or inequitable disposition of his property among those occupying the same relation to him by consanguinity or otherwise, there is a disposition in most minds to seek for a cause for holding the will invalid. The inclination in this direction, that is found to exist in the minds of most, if not all, jurors, cannot always be controlled by instructing them there is no law requiring a testator, nor is he bound, to devise his property equitably or in equal proportions among his heirs. Of course, the law is he may make such disposition of his property as he sees fit, and he may bestow his bounty where he wishes, either upon his heirs or others. While this is undoubtedly the law, the common mind is disinclined to recognize it, and jurors will too frequently seize upon any pretext for finding a verdict in accordance with what they regard as natural justice." This language was quoted with approval in the recent case of *Nieman* v. *Schnitker,* 181 Ill. 400, and is precisely applicable to the condition of affairs in the case at bar. The fact, that there is inequal-

ity in the distribution of the property of a testator or testatrix, cannot of itself have the effect of invalidating the will. (*Graham* v. *Deuterman,* 206 Ill. 378). Moreover, where the testator or testatrix assigns a substantial and sufficient reason for such inequality, that reason must be accepted as true when there is no evidence in the record tending to disprove it. (*Graham* v. *Deuterman, supra*). In the case at bar, declarations of the deceased Mrs. Waters were proven to the effect that she had already sufficiently helped her son, Oliver, and her daughter, Clara; nor was there any evidence, tending to disprove this reason for giving them nothing more than $5.00 apiece by her will.

The appellants introduced in evidence, upon the trial below, the certificate of the oaths of the subscribing witnesses to the will. That certificate was *prima facie* proof of the validity of the will in this proceeding, attacking the probate thereof. Consequently, the burden of proof was upon the appellees, complainants below, as the contestants of the will, to substantiate both charges, that it to say, the charge that the testatrix was not of sound mind and memory when she executed the will, and that she was under the undue influence of her two daughters above named at that time. (*Swearingen* v. *Inman,* 198 Ill. 255; *Johnson* v. *Johnson,* 187 id. 86; *Webster* v. *Yorty,* 194 id. 408; *Michael* v. *Marshall,* 201 id. 70). It was incumbent upon the contestants to overcome the *prima facie* case, thus made through the introduction of the certificate, by a preponderance of the evidence. This they failed to do.

In addition to the certificate in question, the proponents, appellants here, produced fourteen witnesses, including two physicians, who treated the testatrix in the last years of her life, a banker who did business with her, a shop-keeper or clerk with whom she traded, people who boarded at her home, neighbors, and others closely associated with her, all of whom testified that, at or about the time when her will was made, her mind and memory were sound. Some of

them swore that she was an unusually bright and smart woman. It is true that, during the last year or two of her life, she was not only old, but she was feeble and sick, suffering with some kind of neuralgia in her shoulders. In order to sustain the allegation of want of mental testamentary capacity something more must be shown than mere physical suffering, disease and old age. (*Woodman* v. *Illinois Trust and Savings Bank*, 211 Ill. 578; *Wallace* v. *Whitman*, 201 id. 59; *Schmidt* v. *Schmidt*, 201 id. 191; *Freeman* v. *Easly, supra*). Proof, that the testatrix here was suffering otherwise than from disease and old age, is wanting.

To offset the proof, introduced by the proponents of the will to the effect that the testatrix was of sound mind and memory, the contestants introduced a large number of witnesses; but an examination of the evidence of these witnesses tends in no degree to sustain the charge of a want of sound mind and memory. None of such witnesses swear that the mind of the testatrix was unsound.

Lizzie Kurtz, the first witness of the contestants, said: "I saw her in 1901. I don't know what her mental condition was at that time with regard to soundness of mind. * * * I think she was about as well as anybody would be of her age." Mary Kurtz, the second witness of the contestants, says: "I wasn't with her enough to form any opinion as to the soundness or unsoundness of her mind and memory." Nora Geiger, the third witness of the contestants, says: "In my opinion she was sound, but I think the woman was suffering from pain, so that at times she hardly realized where she was or what she was doing. * * * I do not think she would be capable of transacting business at any time. Transacting business is work in one way. It is occupying one's time. I said I thought she was incapable of transacting business, and I do not think she did transact any business of her own. I think she was physically unable to work; that is what I mean; that she was physically unable to work." One witness for the con-

testants says: "I don't think she was capable of doing busi-
ness successfully." Another witness says: "From what I
saw of Mrs. Waters I was able to form an opinion as to
whether she was able to transact the ordinary business of
life; I thought she was too weak in body; her mind was as
rational as we could expect in a person of her age, who had
been sick. * * * She would frequently commence saying
something, and then change it a little, and turn off into
something else, and sometimes refer to it again as if she had
not been talking about it; but nothing that I would call in-
sane or out of her mind, only a little absent-mindedness."
Many of the witnesses of the contestants expressed no opin-
ion at all upon the question of her soundness of mind. No
one of the witnesses of the contestants, so far as we have
been able to ascertain from the record, swears that the testa-
trix was incapable of understanding the business, in which
she was engaged at the time when she executed her will.
Some of them gave it as their opinion that she was not com-
petent to transact the ordinary business of life; but an ex-
amination of their testimony will show that they based such
opinion wholly upon her physical condition as to age and
sickness. Competency, however, to transact the ordinary
business of life is not the test, by which testamentary ca-
pacity is determined. Anyone, having the mental ability
to transact intelligently the ordinary business affairs of
life, is capable of making a valid will, but the converse of
that proposition is not always true. This court has decided
that testamentary capacity exists, if the testator, at the time
of making his will, had such mind and memory as enabled
him to understand the business, in which he was then en-
gaged, and the effect of the disposition made by him of his
property. (*Waugh* v. *Moan,* 200 Ill. 298; *Campbell* v.
*Campbell,* 130 id. 466; *England* v. *Fawbush,* 204 id. 384,
and cases cited). The evidence of the witnesses of the con-
testants is merely to the effect that Mrs. Waters was too
feeble from sickness to devote her attention to her business

222—3

affairs, and in no sense goes to the extent of establishing the proposition, that she was not of sufficiently sound mind and memory to understand what she was doing when she made her will, and to understand the effect of the disposition, which she was thereby making of her property.

*Second*—Nor are we able to see that the evidence tends to support the other charge in the bill, that she was under the undue influence of her daughters, Emma and Lydia. Her unmarried daughters, Emma and Carrie, lived with her and took care of her. All the evidence tends to show that she regarded all her children with kindness and affection, and only cut off two of them because she thought they had received enough of her bounty already. Mrs. Stockberger, though not living with her mother, lived only a few miles away, and was attentive and kind in her treatment in her frequent visits to her mother. "The presumption also is in favor of the validity of the will, when the person, who is provided for therein, is one with whom the testator had maintained intimate and affectionate relations during his life." (*Harp* v. *Parr,* 168 Ill. 459). Here, the relations with the three children, to whom the most of her property was given by the will, were most intimate and affectionate. It was natural, therefore, that she should provide for them in preference to the other children, whose relations had not been so intimate and affectionate, and one of whom had lived for years at a long distance from her.

There is not a particle of evidence in this record, so far as we have been able to discover, to show that Emma Waters and Lydia Stockberger attempted to exercise, or did exercise, any undue influence over their mother. No declarations on the part of these two children in the presence of their mother are proven, and the only acts sought to be proven are that, sometimes when Mrs. Waters was talking with one of her neighbors about her disposition of her property, and one of her daughters, Emma, or Lydia, would come into the room, she would cease her conversation. This act alone,

however, as it is unaccompanied by any other facts or circumstances looking in that direction, was insufficient to show that the mind of the mother was influenced by fear of her daughters, or that she was imposed upon in any way by them.

*Third*—We are of the opinion that the trial court erred in admitting evidence over the objections of the proponents of the will, and in the giving and refusal of instructions.

Two women, who testified in favor of the contestants, said that, on one or two occasions, Mrs. Waters, while engaged in conversation with them, made remarks to the effect "that she wanted to deal equally with all of her family at one time," and substantially that she was in favor of making another disposition of her property than that which she actually made in her will. Counsel for the proponents of the will objected to the admission of this testimony, and moved that it be stricken out. Their objection was overruled, and their motion was denied. We are of the opinion that this was error. The general rule is that statements made by the testator, either before or after the execution of a contested will, which are in conflict with the provisions thereof, do not invalidate or modify such will in any manner, and that parties, making wills, cannot invalidate them by their own parol declarations, made previously or subsequently. (*Dickie* v. *Carter*, 42 Ill. 376; *Taylor* v. *Pegram*, 151 id. 106; *Kaenders* v. *Montague*, 180 id. 300; *Harp* v. *Parr, supra; Hill* v. *Bahrns*, 158 id. 314; *England* v. *Fawbush*, 204 id. 384). The declarations of the testatrix, Mrs. Waters, thus sought to be proved, were declarations in conflict with the provisions of her will, which made an unequal distribution of her property, and, therefore, they were not competent testimony, and should have been excluded.

It is true that where a will is charged to have been executed through undue influence, the declarations of the testator, made before its execution, are admissible by way of rebuttal to show his intention as to the disposition of his

property, upon the ground that a will, made in conformity with such declarations, is more likely to have been executed without undue influence than if its terms are contrary to such declarations. But the declarations thus admissible are those, which are in harmony with the provisions of the will actually made, and not those which are opposed to such provisions. As was said in the *per curiam* opinion in *Kaenders* v. *Montague, supra:* "The general rule, recognized by this court, is, that prior declarations of a testator are not admissible to prove undue influence. That rule, however, is applicable only in cases where the declarations and statements are offered for the purpose of varying or controlling the operation of the contested will, and not to those in which the will is in harmony with the declared intentions of the testator." The declarations and statements here offered had a tendency to vary or control the operation of the will of Mrs. Waters, and were not in harmony with her intentions as declared in her will.

*Fourth*—The proponents of the will upon the trial below asked the court to instruct the jury that "any degree of influence over another, acquired by kindness and attention, can never constitute undue influence within the meaning of the law, and although the jury may believe from the evidence, that the deceased, in making her will, was influenced by any of the said defendants, still, if the jury further believe from the evidence that the influence, which was so exerted, was only such as was gained over the deceased by kindness and friendly attention to her, then such influence cannot be regarded in law as undue influence," etc. The refusal of this instruction was error, and the idea, set forth in it, is not embodied in any of the other instructions given for either party. This court has held in a number of cases that influence secured through affection is not wrongful. (*Thompson* v. *Bennett,* 194 Ill. 57; *Nicewander* v. *Nicewander,* 151 id. 156; *Francis* v. *Wilkinson,* 147 id. 370; *Burt* v. *Quisenberry,* 132 id. 385). In *Burt* v. *Quisenberry, supra,* we said

(p. 399) : "No rule of law requires the parent to distribute his property among his children equally, or upon any ratable basis of relative merit. He may prefer one and cut off another, with or without a reason, or he may cut off all his children and give his property to a stranger, and the only inquiry admissible is, was he, when doing so, of sound mind and free of the undue influence of others. Undue influence means wrongful influence. But influence, secured through affection, is not wrongful, and, therefore, although a deed be made to a child at his solicitation, and because of partiality induced by affection for him, it will not be undue influence. * * * The influence, to render the conveyance inoperative, must be of such a nature as to deprive the grantor of his free agency." The principle thus announced applies to wills as well as deeds. (*Nicewander* v. *Nicewander, supra*).

*Fifth*—We think that the trial court erred in giving the ninth instruction, which was given for the contestants of the will. By that instruction the jury were told "that, if they believed from the evidence in the case that Mary Waters did not read over the contents of the alleged will prior to the time of the execution thereof, and that the same was not read over to her by any other person or persons prior to the execution thereof, or that she was not at any time informed of any provision therein contained, or of the entire contents of said will, or that by reason of the fraud or undue influence of others she did not know the contents of any provision therein, or of the entire will, or if you further believe from the evidence that her mental condition was such that she could not intelligently understand the will at the time she executed it, you should find that the alleged will in question is not the will of Mary Waters, deceased, and you should find the issues for the complainants." So far as this instruction was predicated on the idea that the testatrix, Mrs. Waters, did not know the contents of the will, which she executed, and had not been informed of its provisions, it

is not based upon any evidence in the record. The will was signed by the testatrix at about twelve o'clock on August 7, 1901. Somewhere about ten o'clock on that morning Emma Waters and Mrs. Stockberger were present with their mother at her home, when Mrs. McGilligan called. Emma asked Mrs. McGilligan, who lived in the neighborhood, if her husband, W. K. McGilligan, a justice of the peace and notary, was at home, and, upon her answering in the affirmative, she was asked to send him over because Mrs. Waters wanted to see him. McGilligan came over to the house, and the will was ready for execution at about twelve o'clock. The fair inference from all the evidence is that it was drawn there in the house by McGilligan between ten and twelve o'clock on that morning, but, as McGilligan died before the hearing of this cause, it is impossible to know just what was the fact about the matter. The mere fact, that Emma told the wife of the notary to send her husband over, does not indicate that she had anything to do with dictating the terms of the will. On the contrary, the evidence shows that, when the will was signed, nobody was present in the room with Mrs. Waters except McGilligan, who drew the will, and the two witnesses who subscribed it, Byrnes and Neil. Patrick Byrnes, father of Grant Byrnes, named as executor, is the only witness, who says anything about the reading of the will to the testatrix, and he says: "I don't know of my own knowledge whether or not the will was read over in that room," (the room in which the testatrix was); "I was in another room." This is no evidence to the effect that the will was not read to the testatrix. Patrick Byrnes says that he first went into the room, where Mrs. Waters was lying, and spoke to her about her health, and she said she was very poorly, and he further says: "I came out of the room pretty soon after that. The will was signed in her room. I was in another room when the will was signed, and the squire, the two men who signed the will, and Mrs. Waters are all whom I know were there when the will was signed. When

I went into the house, Mr. McGilligan was in the next room, in the parlor where he had his papers. I do not remember whether the will was read at any time in Mrs. Waters' presence."

John Neil, one of the subscribing witnesses, says: "I was at Mrs. Waters' residence the day the will was drawn; we walked into the room where she lay; she lay west of the door in the bed with her head to the south; I walked to the foot of the bed and faced her; Mr. McGilligan and Mr. Byrnes went into the room with me and were there with me. Mr. McGilligan said it was necessary for her to declare to these gentlemen that this was her last will and testament. Mrs. Mary Waters sat up in bed and said: 'Gentlemen, this is my last and only will.' Mr. William McGilligan then took the will, and walked to her bed, and put the pen in her hand, and took her hand in his, and made the marks she made on the paper. I don't know what the marks were nor that the signature he made was with her hand in his. He then took the paper, laid it on the stand at the side of the bed, east of where she was lying. Mr. Byrnes and I signed the will. She asked me how my family was, and told Mr. Byrnes she was sorry she was keeping him from his work. That was all she said while we were in the room, and we walked out. Physically she seemed weak, but was able to raise herself up without assistance, and sit up in bed."

In view of this evidence the presumption is that she knew the contents of her will. "The law, in the absence of all evidence, will presume that a person, who executes a will or other instrument, does so with knowledge of its contents; but this is a presumption which will readily yield to evidence tending to show that such was not the fact." (*Purdy* v. *Hall,* 134 Ill. 298; *Keithley* v. *Stafford,* 126 id. 507). Here, the testatrix not only executed the will, but showed that she understood the act she was engaged in by stating to those present that the instrument before her was her last and only will, and also indicated that she was in good

mental condition by asking one of the subscribing witnesses as to the health of his family, and expressing regret that she was keeping the other from his work by requiring him to act as a witness to her will. Certainly, here, under the proof thus stated, the presumption is that she knew the contents of the will, and there is no evidence tending to overcome that presumption, or to show that she did not have knowledge of the contents of the will. Instruction, numbered 9 given for the contestants, was calculated to create in the minds of the jury the impression that the testatrix was ignorant of the contents of the will which she signed, and, as there was no evidence upon which to base any such instruction, it should not have been given.

*Sixth*—In addition to what has been said upon this branch of the case, it is to be observed that there was no allegation in the bill, which authorized the introduction of any proof to the effect that the testatrix did not know the contents of the will, and did not read it over, or that the same was not read over to her by any other person prior to its execution. The only charges in the bill are those of unsound mind and memory, and undue influence. It is nowhere charged or alleged therein that Mrs. Waters did not know the contents of the will when she signed it, or that she did not read it, or that no other person read it to her. The appellees cannot in such a case as this, any more than in any other equity case, be allowed to state one case in their bill and prove another case, or have the jury instructed that they can find on another case. Where a bill in chancery is filed for the purpose of setting aside the probate of a will, the complainant in such case will be allowed to impeach the *prima facie* case, made in favor of the validity of the will, only upon the particular grounds that are alleged in the bill. (*Purdy* v. *Hall,* 134 Ill. 298; *Carmichael* v. *Reed,* 45 id. 108; *Flinn* v. *Owen,* 58 id. 111). In *Swearingen* v. *Inman,* 198 Ill. 255, upon this very subject it was said: "It is insisted that there was ground for invalidating the will in the

fact that the testatrix did not know its contents when she signed it. Complainants could not have prevailed on that ground if it had been proved, because it was not alleged in the bill. They would not be allowed to have the will set aside upon grounds not alleged, or to state one case in their bill and prove another. * * * The claim, that the testatrix did not know how she disposed of her property, is neither the same as, nor consistent with, the averment that she was induced to make a particular disposition of her estate by the undue influence of her husband." The language thus used is precisely applicable to the situation in the case at bar. Consequently, the instruction was erroneous for this additional reason, besides the fact that it was not based upon any evidence in the case.

We have hereinabove disposed of all the errors assigned, and are of the opinion that the decree of the lower court, based upon the verdict of the jury to the effect that the instrument in question was not the will of Mary Waters, is erroneous. Accordingly, the decree is reversed, and the cause is remanded to that court for such further proceedings as to justice and equity may appertain.

*Reversed and remanded.*