FREEMAN BEEMER, Appellee, *vs.* ADDIE M. BEEMER, Exrx. Appellant.

*Opinion filed December 21, 1911.*

1. WILLS—*what evidence not sufficient to show a lack of testamentary capacity.* Evidence on the part of the contestant in a will case falls short of showing a want of testamentary capacity where, at the most, it merely discloses that the testator was old and suffering from a cancer, which caused him extreme suffering.

2. SAME—*fact that man cries from pain is not an indication of an unsound mind.* A tendency to cry as the result of little or no provocation may be an indication of mental unsoundness in a man, but the fact that a man cries when suffering extreme physical pain is not an indication of mental weakness.

3. SAME—*what circumstance does not tend to show a want of testamentary capacity.* The fact that the testator devised to a daughter a tract of land he had contracted to sell to a third person is not evidence of mental unsoundness but rather the reverse, as it shows an intention to give the daughter the land if the purchaser did not fulfill his contract, or the proceeds thereof if the purchaser fulfilled his contract after the testator's death.

4. SAME—*when a decree setting aside will on verdict of jury must be reversed.* A decree setting aside a will upon the verdict of a jury finding that the testator was of unsound mind must be reversed, where, assuming as true the facts testified to on the part of the contestant, they are not sufficient to overcome the undisputed facts proven by proponents showing testamentary capacity.

APPEAL from the Circuit Court of Lee county; the Hon. O. E. HEARD, Judge, presiding.

CHARLES F. PRESTON, and A. H. HANNEKEN, for appellant.

WILLIAM H. WINN, and BROOKS & BROOKS, for appellee.

Mr. JUSTICE COOKE delivered the opinion of the court:

Appellee, Freeman Beemer, filed his bill in the circuit court of Lee county to set aside an instrument which had been probated as the last will and testament of his father,

Henry Beemer. To this bill the executrix and the remaining heirs-at-law and devisees were made parties defendant. Adelia Argraves defaulted, a guardian *ad litem* was appointed for the infant defendants, and all the remaining defendants answered. As grounds for setting aside the will the bill alleged the testamentary incapacity of the testator, and undue influence on the part of the widow and a son who was the chief beneficiary under the will. At the close of all the evidence the court instructed the jury that there was no evidence of undue influence, and that they should not consider the testimony offered on that question in making up their verdict. The jury found that the testator was not of sound mind and memory and that the writing offered in evidence was not his last will and testament, and the court entered a decree accordingly. From that decree the executrix has appealed.

But two grounds are urged for reversal: First, that the court erred in giving instruction No. 3 on behalf of contestant and in refusing to give instructions Nos. 2 and 3 asked on behalf of proponents; and second, that the verdict of the jury and the decree of the court are against the clear weight and preponderance of the evidence.

Instruction No. 3 given on behalf of contestant is in the exact language of an instruction approved in *Dowie* v. *Sutton*, 227 Ill. 183, and there designated as instruction 18, and was properly given. The substance of instructions Nos. 2 and 3 asked on behalf of proponents was given in other instructions in the series, and for that reason were properly refused.

The contention that the verdict and decree are against the clear weight and preponderance of the evidence presents a serious matter for consideration and will necessitate a discussion of the evidence.

Henry Beemer, the testator, died March 12, 1910, leaving surviving him his widow, Addie Beemer, the executrix of the will, and his four children: Freeman Beemer, the

appellee, and Adelia Argraves, children of a former wife, and Lee Beemer and Luella Bradley, children of Addie Beemer. He died seized of 201 acres of land in Wyoming township, Lee county, Illinois, worth $30,000, and 320 acres of land in Deaf Smith county, Texas, (subject to a contract of sale to Franklin Beemer, a brother,) worth $5000, and about $11,000 in personal property. By his purported will he devised to his wife all his household goods and $5000, stating that as he had already conveyed to her 320 acres of land in Deaf Smith county, Texas, worth $5000, he deemed that to be a suitable and adequate provision for her. To his son Lee Beemer he devised his real estate in Lee county and all the personal property thereon. To his son Freeman, and to his daughters, Adelia and Luella, he bequeathed the sum of $1000 each, and to his daughter Luella he also devised the 320 acres of land in Deaf Smith county, Texas. Of the residue he gave to his wife one-third in her own right and the remaining two-thirds to her as trustee, for the use and benefit of the children of his daughters, Adelia and Luella. The instrument further provided that in case any of his devisees or legatees brought suit to contest his will, the share devised or bequeathed to the one so contesting should be forfeited and he or she should receive nothing from the estate. The will named his wife and his son Lee as the executors. The son having refused to qualify, the widow is acting as sole executrix. The instrument was dated July 28, 1909. At the time of its execution Henry Beemer was seventy-six years of age. At that time he was living on his farm in Lee county but was not then actively engaged in farming, the land being leased. About a year before the execution of his purported will he became afflicted with a cancer under his tongue. It does not appear that he consulted any physician in reference to his ailment until some time in the spring of 1909, when the disease had made considerable progress. He seemed to be loath at first to admit that it

was a cancer. He consulted the local physician, Dr. A. W. Chandler, of Compton, who treated him for some time. He then consulted Dr. F. G. Arter, of Chicago, in the latter part of May, 1909, who treated him until some time in August following. His condition from the first seemed to be hopeless so far as the prospect of a cure was concerned, and as the disease progressed the testator suffered intense pain, particularly at the times when the medicines prescribed were administered. During the summer of 1909 he was able to be up and about the place as usual, went to Chicago on two or three different occasions while taking treatment with Dr. Arter, and went to Compton and Paw Paw, in Lee county, at various times. From April 1, 1909, up until the time of his death, being the period covered by the testimony, he was able to, and did, transact such business as it was necessary for him to transact. It was conceded by contestant that prior to April 1, 1909, Henry Beemer was of sound mind, and that it was only subsequent to that time that he became mentally incapacitated.

Thirty witnesses testified on behalf of proponents, including two of the attesting witnesses, and each of them expressed the opinion that the testator was of sound mind. One of the attesting witnesses, Frank Wheeler, was the assistant cashier of the State Bank of Paw Paw and had known Henry Beemer twelve or fifteen years. The other attesting witness, S. W. Carnahan, was about the same age as the testator and had known him since they were about twenty years of age. On the day the will was executed Beemer went to the bank and requested Wheeler to go to the office of C. F. Preston, the attorney who drew the will, and sign as a witness. He met Carnahan on the street in Paw Paw, and after conversing with him a while, and having inquired if he believed that he (the testator) was capable of transacting his own business, asked him to attest the will. The other witnesses consisted of the two physicians who had treated him for cancer since April 1, 1909,

a trained nurse in Dr. Chandler's hospital at Compton, two brothers and a nephew of the testator, Dennis Hirley and his wife, with whom the testator had boarded while in Chicago taking treatment from Dr. Arter, and various intimate friends and neighbors who had known him from five to forty years prior to his death. All of these witnesses had seen and conversed with testator, and some of them very frequently after April 1, 1909, and twelve of them had business transactions with him after that time.

H. L. Fordham, cashier of the First National Bank of Compton, testified that he had known Beemer all his life and that testator had deposited money in his bank. During April or March he consulted the witness in regard to a contract that he was giving a real estate agent to sell his land in Texas. On September 6, at testator's request, he prepared a bill of sale whereby his personal property was conveyed to his wife. In the month of September he acted as a commissioner appointed by the county court to take the testimony of the testator on a petition which testator had filed to perpetuate his testimony. In March, 1910, he was requested to go to testator's home, at which time the testator executed a release of a mortgage deed which he held to the lands of appellee in the State of Iowa. At that time the testator and appellee settled the indebtedness which the mortgage secured, in which settlement appellee gave testator a check and his note for $120. The check was delivered to witness by testator, with the request that he deposit it in the bank and make out a certificate of deposit to him.

Dr. A. W. Chandler testified that he had been a practicing physician twenty years, during all of which time he had known Henry Beemer. After April 1, 1909, Beemer came to his office to consult him concerning a growth in his mouth, which witness ascertained, upon examination, to be a cancer, and which testator told him had been there for a year previous to that time. His physical condition at

that time was very good, considering his age. Testator came to his office for treatment every two or three days during the month of April. Witness saw him once or twice in the winter previous to February 17, and he saw him the last time on that date. At those times he saw him at his home. When he first saw Beemer the cancer was so enlarged that it involved the tongue, cheek and the glands, reaching down to the collar bone. At that time it had not affected him very much physically. That condition of physical strength continued about the same until some time in November, when he began to show the result of failure to assimilate his food. When witness first saw him he told him that the cancer could not be removed, and it was understood in their talk that if it could not be removed it would kill him. Witness testified that at the times he saw him since April 1, 1909, he believed him to be of sound mind.

Dr. F. G. Arter testified that he was a physician located in Chicago and was a cancer specialist. He first became acquainted with testator in May, 1909, at witness' office in Chicago. At that time he had a conversation with him concerning himself, the growth in his mouth and his general health, and made an examination of him and arranged to give him treatment. He saw him next on May 27, when he returned to Chicago and stayed for seven days. During that time he saw him every day, and on two days saw him twice. At that time the witness examined his mouth and tempered his medicine because the medicine used produced pain, and he had to ascertain what strength of medicine the testator could bear. After he left on June 3 he returned in a week or ten days and remained a few days at that time. He next saw him at his home on June 30, where the witness remained two days. He treated him while there, gave him medicine and examined him. He saw him again, and for the last time, on the 6th of August. His physical condition was not so good then as it had been, but it was

not very bad at that time. Witness conversed with testator each time he saw him. In the first interview Beemer contracted with him for the treatment witness was to give him and agreed upon what witness should be paid for his services. On all occasions witness considered him of sound mind, but testified that there were times when he was so worried that he believed he was temporarily incapable of transacting business.

Nearly all of these witnesses testified to the physical condition of Henry Beemer and to the pain which he was evidently suffering as a result of his affliction, and all of them testify, in detail, to his actions and to conversations they had with him.

On the part of the contestant eight witnesses testified on the question of mental capacity. Linn Argraves, a brother-in-law of Adelia Argraves, testified that he was thirty-six years of age and had been acquainted with Henry Beemer all his life. He saw testator walking around on the depot platform at Compton on May 22, 1909, and he went over to him and asked how he was feeling. He said he was feeling poorly and was going to Chicago to see a doctor. He was walking around and holding his head in his hands, and witness asked him to sit down on a truck with him, where they talked about different things. On being asked by witness if he were in much pain, testator said that at times he suffered untold agonies, and if he did not get relief pretty soon it would kill him or he would go crazy. That was the last time witness ever saw him to speak to him, although he noticed him around the house and in the yard when driving by his place. While he was talking with him on May 22 he formed an opinion that his mental condition was unsound. On cross-examination he stated that testator acted like a man who was suffering so much pain that he did not know what he was doing, and that he told him the pain was caused by a cancer in his mouth.

Rinear Miller, a brother of testator's first wife, testified that he had known him intimately since 1849. He visited him quite often after April 1, 1909, and the main conversation he had with him about his condition was at testator's home in the first week of June, 1909. Witness sat down on the side of the porch and testator came and sat down close beside him, leaned his head on the witness' shoulder, and, commencing to cry, told him about his condition, and said that the cancer was paining him so much that it was going to drive him crazy unless he could get some relief; that he couldn't do anything and he didn't know anything, and he could not endure the pain, it was so great. He asked testator a few questions about his business, and was told that his business was all settled up. He saw him two or three times after that, and formed the opinion that his mental condition was unsound.

Millard Beemer, a cousin of testator, testified that he had known him all his life, and lived as his nearest neighbor for a number of years but now lived in Compton. He saw him at his home a great many times from April 1, 1909, up until the time of his death, and each time he was there talked with him about his physical condition and about the cancer. Many times the testator would hold his face in his hands and say he was "awful bad;" that it pained him awfully; that if it did not get better soon it would kill him, and that he was nearly crazy. Sometimes when he was talking he would walk the floor and sometimes he would sit down. Witness saw him cry two or three times when he was talking about his condition. From these conversations witness testified that he had formed an opinion as to the testator's mental condition, and that he believed that he was at times of unsound and at times of sound mind. Witness took testator and his wife to Paw Paw on the day the will was executed, but could not say whether he was mentally sound or not on that day, as he did not see him have any of his spells.

Alvin Beemer, a son of Millard F. Beemer, testified that he was living on the farm adjoining Henry Beemer's place during 1909 and 1910. After April 1, 1909, he saw the testator frequently and talked with him. He had seen him hold his hand to his head and say the cancer hurt him; that it was just like sticking a knife into him, and he thought it would kill him or he would go crazy. Witness expressed the opinion that at times he was of sound mind and at times he was of unsound mind. He testified that he had seen the testator cry, and in his opinion he was of unsound mind at those times. On cross-examination witness stated that he believed testator was of unsound mind only when he cried. He had seen him cry when the cancer was bleeding and hurting the worst, and that he believed he was crying because of the pain he was suffering. At other times the witness believed he was of sound mind. He transacted business with him that summer, having sold him some straw and bought some wood from him.

Helen Argraves, the mother-in-law of Adelia Argraves, testified that she was a cousin of Henry Beemer and had known him all her life. She then lived in Sterling but had lived in and around Compton nine years before. On the 23d of July, 1909, she saw testator in his home. When she stepped into the house he arose from a couch on which he was lying, and she said, "How do you do, Henry?" and put out her hand to shake hands with him, but he only stared at her. The witness then said, "Don't you know me?" and he made no reply, and when she said she had come to see him because she had heard he was sick, he said, "Why, woman, my mouth is killing me; I am going crazy; I don't know anything; I don't neither eat or sleep," and stood there for a few minutes saying nothing more. He then went out of the door and sat down on the steps, and as she passed him when she departed he had his hands up to his face and was weeping. From what he said

and did on that occasion she formed the opinion that he was of unsound. mind.

Stephen Parker testified that he had been acquainted with Henry Beemer three or four years, and was at his place in September, 1909, where the witness and his father were erecting a cement building for Lee Beemer. He was at work there three days and saw testator each day. Testator said the building would have been different if he was doing it. While the work progressed testator would sometimes tell them that they didn't use enough cement in the blocks, and sometimes he didn't like the gravel. One day he told them all about his cancer. He said it hurt him terribly at that time, and felt just as if his jaw was being pulled off. Witness believed he was of unsound mind because he said he was crazy with pain and cried when he was suffering pain. He first formed the opinion that he was of unsound mind the day before the building was finished, when Beemer got into an argument with an old man working there, named Klapper, as to whether he had attended Klapper's wedding.

William Parker, the father of Stephen Parker, testified that he had known testator for forty years. In September, 1909, he was at the testator's place assisting his son, Stephen, in laying cement blocks. While there he saw testator and believed him to be of unsound mind. He based his opinion on a conversation he heard between testator and Klapper. Testator had said to Klapper, "I was at your wedding one time," and Klapper said, "I guess not," and he said, "I was at John Miller's, and John was going down and I went with him." Klapper said that was not true, and testator said it was.

Frank Miller, a son of Rinear Miller and a cousin of appellee, testified that he had lived on a farm near Compton for thirty-five years and knew Henry Beemer well. He saw him about the first of May, 1909, at the Chandler hospital and talked with him in regard to his trouble. Testa-

tor said he had come to see Dr. Chandler about his cancer; that it was giving him a great deal of trouble, and that he didn't think he would ever get well. Witness saw him also on July 23 at his home and asked him how he was feeling, and he said, "Awful bad," and, "I am crazy with pain; if I don't get this stopped pretty soon it will kill me." He cried at that time, and witness formed the opinion that he was of unsound mind. On cross-examination he stated that he talked with him that time about five minutes, and he then concluded that the testator was of unsound mind, and that he based his opinion upon that conversation.

The theory of contestant is, that as the disease with which Henry Beemer was afflicted progressed it gradually broke him down physically and mentally, so that on April 1, 1909, and subsequently, he was so unsound mentally that he was incapable of making a will. The actions and conversations of the testator described and detailed by each of the eight witnesses for contestant, and upon which were based the opinions that he was of unsound mind, were all the result of and concerning his disease and physical suffering. It is evident that during the period covered by the testimony the testator was greatly afflicted physically and at times his suffering was intense. As the disease progressed the ravages of the cancer extended to the exterior of the chin and throat, so that it became necessary to apply bandages. From the time that he first consulted Dr. Chandler and learned that the disease had progressed to the extent that it would be impossible to remove the cancer, the testator knew that he was stricken with a fatal disease and that he had but a short time to live. It is but natural that this knowledge should cause anguish, worry and mental depression, and it is evident from the testimony that it did so. But the evidence on the part of the contestant falls far short of establishing that degree of mental unsoundness which creates a lack of testamentary capacity. The most that can be said of it is, that it disclosed the existence of

extreme physical suffering, disease and old age. In order to sustain the allegation of want of testamentary capacity something more than this must be shown. *Waters* v. *Waters, 222* Ill. 26.

Some of the witnesses testified that they sometimes saw the testator cry, and it is urged that this is an indication of mental unsoundness in a man. That is true when it is the result of little or no provocation or cause, but in this case there is no evidence that testator cried or showed any signs of weakness except àt the times when he was suffering intense pain. It may be that it would have been more admirable had he borne his suffering with more Spartan-like courage and fortitude, but it would certainly be unreasonable to say because he gave voice to his physical pain by crying out and shedding tears that he was mentally unsound.

It is urged that as the testator, on April 15, 1909, contracted to sell his real etsate in Deaf Smith county, Texas, to his brother, Franklin, and executed a contract of sale whereby he bound himself to convey the same on November 15, 1911, upon the payment of the purchase price therein named, and that he afterwards, on July 28, 1909, by his will devised this same real estate to his daughter Luella, he did not have the capacity to understand the nature, extent and amount of his property. It is contended that this devise is an indication that the testator could not remember the contract of April 15, 1909. If any importance at all is to be attached to this circumstance it might well be argued that it was an indication of mental soundness. By the contract of April 15 the testator merely agreed to make a conveyance of this land to his brother at a future time upon the payment of the purchase price. He still held the legal title. If the purchaser failed to comply with his part of the agreement the land remained the property of Henry Beemer if he should live, and if the failure to perform should occur after his death the title then passed to his devisee. Nor

would the daughter Luella be a mere trustee for the conveyance of the legal title and the devise to her be an empty one in case Franklin Beemer should perform his part of the contract after the death of the testator. In that event the proceeds of the real estate devised to Luella Bradley subsequently to the contract of sale would belong to her under the will. (*Wright* v. *Minshall,* 72 Ill. 584; *Covey* v. *Dinsmoor,* 226 id. 438.) By this devise the testator made it certain that in the event the purchaser failed to perform, the land would go to his daughter, and in the event the contract was fulfilled and the purchase price paid she would then receive the proceeds.

There is no evidence in the record which discloses the motive of the testator in making an unequal distribution of his property among his children. It was not shown whether this was on account of advancements theretofore made to the son and daughter of his divorced wife, who were bequeathed only $1000 each, or for other reasons. Henry Beemer, if he was of sound mind, had the right to make any disposition of his property that he saw fit. If there was evidence in the record to indicate mental unsoundness then it would be .proper to take into consideration the unequal distribution of the property, but under the state of this record the fact that the testator did make an unequal distribution has no weight.

During the time covered by the testimony, from April 1, 1909, until the time of his death, the evidence shows that the testator transacted business and apparently gave his personal attention to his business affairs. During the summer he hoed in the garden and did other work about the premises. He was able to be up and around until shortly before his death. About April 1 he settled with H. W. Steafbold for grain which he had sold to him. On April 15 he negotiated with his brother, Franklin, for the sale of the Texas land and executed a contract of sale.

During that spring he settled with Franklin Beemer for his share of the taxes upon a tract of land which he and Franklin owned jointly and upon which Franklin had paid the taxes. In May he contracted with Mrs. Hirley for his board while he would be in Chicago taking treatment from Dr. Arter, and at the same time contracted with Dr. Arter in reference to his charges for the treatment. In the fall he sold hay to Harvey L. Rhoads. During the summer he went to the blacksmith shop of Ernest Clemmons and had a point put on a plow shovel. On September 6 he executed and acknowledged a bill of sale of his personal property on the farm to his wife. On November 19 he had his testimony perpetuated upon his own petition. During the summer he purchased straw from Alvin Beemer, and on November 2 he settled with him for the rent of his farm and took a note from him for $215. In January, 1910, he sold Alvin Beemer some wood. On March 4, 1910, in a settlement which was conducted personally between testator and appellee, he executed a release of a mortgage deed to the lands of appellee in the State of Iowa. In the settlement he took appellee's note for $120 and a check for the balance due, which he gave to H. L. Fordham, cashier, with directions to deposit in the First National Bank of Compton. Each of the persons who transacted business with him testified that he was of sound mind, with the exception of appellee, who was an incompetent witness and did not testify, and Alvin Beemer, who says that at times he was of sound mind and other times he was not.

While we appreciate fully the weight which should be given to the verdict of the jury and the decree of the chancellor in cases of this kind, we regard the verdict of the jury as manifestly against the clear weight of the evidence. Assuming as true all of the facts testified to on the part of contestant, it is not sufficient to overcome the undisputed facts proven by the proponents of the will, and that being

true, the decree must be reversed. *Graham* v. *Deuterman,* 244 Ill. 124.

The decree of the circuit court is reversed and the cause remanded for a new trial.     *Reversed and remanded.*