CHARLES S. GRAHAM *et al.*

*v.*

ALICE DEUTERMAN *et al.*

*Opinion filed December 16, 1903.*

1. WILLS—*unequal division of property as an element bearing upon mental capacity.* An unequal division of property among the testator's children may be considered by the jury as bearing upon the testator's mental capacity but does not of itself invalidate the will.

2. SAME—*when a verdict against will should be set aside.* A verdict finding the testator to be of unsound mind should be set aside, where the evidence in favor of his sanity not only preponderates as to the number of the witnesses, but is much more positive and convincing than the opposing evidence.

3. SOLICITORS' FEES—*allowance of fee paid by executor is discretionary.* The matter of allowing a reasonable solicitor's fee paid by the executor for defending the will rests in the sound discretion of the trial court, and refusal to make such allowance is not reversible error.

APPEAL from the Circuit Court of McLean county; the Hon. COLOSTIN D. MYERS, Judge, presiding.

BLINN & HARRIS, and WELTY & STERLING, for appellants.

LIVINGSTON & BACH, and F. L. CAPPS, for appellees.

Mr. JUSTICE WILKIN delivered the opinion of the court:

This is a bill in chancery brought by Alice Deuterman and her two sisters and four brothers, appellees, to contest the will of their father, William A. Graham, deceased.

On the 6th day of July, 1901, William A. Graham executed his last will and testament, by which he gave all of his personal property to his widow, Mary A. Graham, and also all of his real property for life, charging her with the duty of supporting and educating his minor son, Arthur E. Graham. The remainder in the real estate, after the death of the widow, was devised to his sons Charles S. Graham and Arthur E. Graham, subject to

the payment of $25 to each of his four remaining sons and three daughters. On the 14th day of August, 1901, said William A. Graham died, owning one hundred and sixty acres of land and a small amount of personal property, being indebted in the sum of about $3000. The will was admitted to probate in the county court of McLean county, and Charles S. Graham and Mary A. Graham were duly appointed executors thereof. On November 3, 1902, the seven appellees, who had been bequeathed, by the will, $25 each, filed in the circuit court of McLean county this bill to contest said will, on the ground that the testator, William A. Graham, was not, at the time of the execution of the same, of sound mind and memory, and that he was induced to make it by the undue influence of Charles S. Graham and Mary A. Graham. Upon the trial before a jury, the testator, William A. Graham, was found not to have been of sound mind and memory at the time of the execution of his said will, the court instructing the jury to find for appellants on the issue of undue influence. A motion was made by the proponents for a new trial, which was overruled by the court and a decree entered setting aside the will. To reverse that decree this appeal is prosecuted.

Objection is made to a single instruction given by the trial court on behalf of the contestants, to the effect that an unequal division of property among children by a testator could be taken into consideration by the jury in determining the mental capacity of the testator. We see no objection to this instruction. It is in conformity with our decision in the case of *Pooler* v. *Cristman*, 145 Ill. 405.

Objection is also made to the refusal of the trial court to allow a reasonable solicitor's fee paid by the executors in defending the will. There is no reversible error in that refusal, the matter being one committed to the sound discretion of the trial court.

The most serious and substantial error assigned by the appellants is, that the verdict of the jury is against

the preponderance of the evidence, and should therefore have been set aside by the trial court.

It appears from the evidence that the testator was about seventy-two years of age at the time of the execution of his will. He had been afflicted with defective eyesight from the time he was a small boy, to such an extent that he could see only a part of the letters of a word at the same time, on account of which affliction he had not learned to read or write. He was therefore compelled to receive assistance from members of his family in the transaction of his business. On the 12th day of February, 1900, he went to a justice of the peace in McLean county and procured him to draw a will, which he duly executed in conformity with the provisions of the statute. After that instrument was executed he placed it in the custody of his bankers, where it remained until shortly prior to his death. For some reason he became doubtful whether it had been legally executed and sent an attorney to get it from the bank and examine it. Upon such examination his attorney decided to re-write it, and on July 6, 1901, did so, and it was re-executed by the testator, being substantially, if not literally, a copy of the one previously executed. At the time of its execution the testator was asked why he gave so little to some of his children and so much to the others, to which inquiry he replied, in substance, that those to whom but little was given had received their portion; that he had given them money and had paid accounts and notes for them, but that his son Charlie had never received a dollar.

The evidence as to the mental capacity of the testator at the time of the execution of the will is somewhat conflicting, but when fairly and impartially considered we think clearly preponderates in favor of his soundness of mind and memory within the requirements of the law as to testamentary capacity. The following will be found a fair synopsis of the testimony of the several witnesses introduced by the respective parties:

R. F. Quisenberry testified on behalf of the proponents that he was book-keeper for the People's Bank; that he had known William A. Graham for twelve years; that he signed the will as a witness; that Graham asked him to sign it; that the will was read to Graham, paragraph by paragraph; that after the reading was completed, Mr. Harris (the attorney who wrote the will) asked the testator why it was he gave so little to some of his heirs and all to the rest, and that he replied that they had received their portions in money, accounts and notes paid, and that Charlie had never received a dollar; that in his opinion the testator was capable of transacting ordinary business; that he did not notice any difference in his mental condition at that time from what it had been during the time he had known him; that the testator could not read or write.

J. E. Arnold testified that he had known the testator all his life; that he had not seen much of him during the past three or four years, for the reason that he had had an ankle broken and did not go to town very much; that he had transacted business with him; that he signed the will as a witness at the testator's request, and that in his judgment he was capable of transacting ordinary business; that he at that time named his children and explained why he was not making their shares equal.

Dr. J. T. Webster testified that he had known the testator nine or ten years; that he saw him two days before his death; that in his judgment he was a man of as sound mind and memory as the ordinary run of men, but that at the time he last saw him he was in a dying condition.

Jason T. Place testified that he had known the testator thirty years; that he saw him in March before he died; that he transacted business with him,—loaned him money; that he had poor eyesight, but that he was of sound mind and memory; that though physically weak he was capable of transacting ordinary business.

Rev. J. W. Derr testified that he had known the testator for about four weeks before his death; that he had talked to him with reference to his spiritual condition; that so far as he had had conversations with him he thought he was a man of sound mind.

Rev. Mary Moreland testified that she had met the testator a few days before his death; that she talked to him about a half hour with regard to religion, and in her judgment he was a man of sound mind.

Howard McFarland testified that he had known the testator all his life; that he had sold goods to him on several occasions; that he was at his house on July 26, 1901, and talked with him for ten or fifteen minutes at that time; that in his judgment he was of sound mind, and he did not discover any difference in his mind and memory or mental faculties from what they had been.

John L. Bevan testified that he was a practicing lawyer; that he had been personally acquainted with the testator twenty or twenty-five years; that he had transacted business for him, but had not seen him much during the past two or three years; that he saw him last in June, 1901, and acknowledged a deed for him, and thought that he was capable of transacting ordinary business at that time, and did not discover in his mental faculties or memory any difference from what they had always been.

George Church testified that he drew the will executed by the testator in December of 1900; that he read its provisions to the testator, and that the testator took the will away with him.

Stacy B. Kinzie testified that he had known the testator since 1880; that he was a witness to the will executed by him in the office of Church, justice of the peace, in December, 1900; that he saw the testator sign it; that he did not have much talk with him, but that he did not notice any difference in his mind from what it had always been since he had known him, and that at that time he was capable of transacting ordinary business.

H. C. Haas testified that he had known the testator forty years; that he had transacted business with him,—sold him goods; that he was in his store in Atlanta the winter before he died; that while he was physically weak, yet he was capable of transacting ordinary business.

George I. Vanness testified that he was a justice of the peace; that he took the census of 1900, and that he got all the facts with reference to the farm and family of the testator from the testator himself; that he seemed to have a pretty good recollection, and would say at that time he was capable of transacting ordinary business.

Edward Stubblefield testified that he had known the testator for twenty-five years; that he traded with him in 1890 and 1891; that he talked with him a year or two before his death, and that he talked like a man who was capable of transacting business; that he did not notice any difference in him at that time from what he had been for years before.

D. M. Longworth testified that he knew the testator for twenty years; that he had conversations with him but never transacted any business with him; that he saw him within a year before his death, and at that time he was as capable of transacting business as he was at any time; that he noticed no change in his mental condition.

Charles H. Turner testified that he was cashier of the People's Bank at Atlanta, Illinois, and had done business with the testator for twelve or thirteen years,—the last time about four months before his death; that he at that time got money on a check; that he had borrowed money from the bank, had given notes, had paid notes and had made deposits; that he thought he was capable of transacting ordinary business; that transacting business with him was a pleasure, and not a trouble.

L. F. Gifford testified that he had known the testator twelve years; that he had transacted business with him from two to six times a year for ten years; that he had sold him stoves and hardware, the last time within five

or six months before his death; that in his judgment he was capable of transacting ordinary business, and he did not see any difference in him from what he had always been, so far as his mind was concerned.

On behalf of appellees, Abel Larrison testified that he had known the testator for forty years; that he had not seen him much in the last five years; that he never considered him of sound mind; that he never transacted any business with him, but always did his business with some member of the family.

Samuel Iddings testified that he had known the testator twelve or fourteen years; that he saw him three times just before his death; that he hardly thought he was of sound mind; that he never transacted any business with him, but always with some member of the family; that he did not seem to trust himself; that a few months before his death he transferred to him three acres of land, and at the time the deed was given witness did not think him competent to transact business.

A. C. Arnold testified that he had known the testator since 1874; that he did not see him much from 1874 to 1901; that he saw him in May, 1901; that he did not think he was of sound mind; that his conversation was disconnected; that he was very weak.

Henry C. Montgomery testified that he had known the testator forty years; that he saw him many times; that he could talk pretty well, but as to his business faculties he was deficient; that he saw him three or four times just before he died; that he was in bed, and bad off; that he tried to buy land of the testator at one time, but failed; that he did not think him capable, in law, of making a deed.

James Foot testified that he knew the testator twelve years; that he never had any dealings with him; that he had a conversation with him nine years before his death; that he never thought him of sound mind or memory, but did not know the condition of his mind in 1901; that he had not seen the testator to speak to him for nine years.

Mrs. Hattie Nicholson testified that she knew the testator twelve years; that she visited him at his home for the past eight years, nearly every week; that she saw him and talked with him two or three times a week for the last six months; that she was there two days before he died; that his mind was weak, and he would drop off to sleep while he was talking; that he was not of sound mind; that he had not been capable of transacting ordinary business for eight or nine years.

Mrs. Mollie Summers testified that she had known the testator since 1871; that his father had married her mother; that she did not think him capable of transacting ordinary business; that she had not seen him much since 1874.

Alice Deuterman, one of the complainants, testified that she had a conversation with John L. Bevan after the death of her father, in which he told her that the testator was a man of unsound mind and incapable of making a will.  Curtis Graham, a son, testified to the same thing.  Bevan testified that he had no recollection of making such a statement.

Pendleton Howard testified that he had known the testator since 1867; that he had not had much talk with him for ten or twelve years before he died; that he saw him just before his death; that he did not notice any difference in his mental capacity from what it used to be, only once in a while he got a little bit off; that he was so weak he could not talk; that he did not think he was of sound mind, but he could not just say that he was not.

William Cook testified that he had known the testator forty years; that he talked with him and did business with him; that he saw him a few days before his death and did not think he was of sound mind; that he was fickle-minded; that he was of unsound mind because he went back on his contract.

Mrs. J. B. Voight testified that she had known the testator eighteen or twenty years; that her half-brother

married his daughter; that she saw him last on July 5, 1901; that he did not know her; that he was very weak; that he was then of unsound mind.

Mrs. Caroline Zimmerman testified that she was the mother of Mrs. Charles Voight; that she had been at the testator's house in July, 1901; that she had known the testator for forty years; that he could not carry on a connected conversation when she saw him; that he was in bad shape.

This is all of the evidence *pro* and *con* bearing on the question of mental capacity.

Counsel for appellees have called our attention to mis-statements, contradictions, etc., in the testimony of some of appellants' witnesses. They are not of controlling importance. Evidence was offered by both parties of little or no value. That produced in favor of the validity of the will is not only by a greater number of witnesses, but their testimony is much more positive and convincing than that of those produced by the complainants. The evidence shows that during the last years of his life the testator was bodily very weak, and, as before said, his eyesight was exceedingly deficient, and for that reason, in part at least, he required the assistance of others in the transaction of his affairs. We cannot escape the conviction that many of the witnesses testifying to his want of mental capacity were influenced in their opinions by that physical infirmity. In any view of the evidence we are unable to see how it can be fairly said that he was of unsound mind and memory. The fact that there is inequality in the distribution of his property cannot, of itself, have the effect of invalidating his will. Moreover, he assigned a substantial and sufficient reason for such inequality, and that reason must be accepted as true, there being no evidence in the record tending to disprove it. We are not unmindful of the weight due to the verdict of the jury and decree of the chancellor, they having seen all the witnesses and heard them testify,

and if we could say that that finding and decree were fairly sustained by the evidence, we would unhesitatingly affirm the same. This we cannot do, but regard the verdict of the jury as manifestly against the clear weight of the evidence. The trial court should have set it aside and dismissed the complainants' bill of complaint.

The decree of the circuit court must therefore be reversed, and the cause will be remanded for another trial.

*Reversed and remanded.*