*In re* ALLEN'S ESTATE.

1. WILLS—UNDUE INFLUENCE—EVIDENCE—REMOTENESS.

In proceedings by testator's daughter by his first wife to contest his will on the grounds of mental incompetency and undue influence exercised by the second wife, with whom he had lived for 31 years, evidence of attentions paid by testator to her before his divorce from his first wife should have been excluded as too remote.[1]

2. SAME—INFERENCES.

Although the inference may be drawn from the evidence that the dislike of testator's first wife and daughter for the second wife was returned by her, it has no probative

[1]Wills, 40 Cyc. p. 1161.

value upon the issue as to whether she exercised undue influence.[2]

**3. SAME—VALIDITY OF WILL.**

If testator's reason for leaving his daughter out of his will was because of her annoying importunities for money after he thought she was capable of caring for herself, his act must stand.[3]

**4. SAME—EVIDENCE—STATEMENTS BY TESTATOR NO PROOF OF TRUTH OF WHAT HE STATED.**

Statements by testator relative to acts and utterances of his second wife adverse to his daughter did not constitute proof of what he so stated.[4]

**5. SAME—UNDUE INFLUENCE—STATE OF TESTATOR'S MIND MAY BE SHOWN BY STATEMENTS.**

The exercise of undue influence must be established by testimony wholly independent of statements or declarations of the testator, but when undue influence is shown to have been exercised, its effect may be disclosed by the state of mind of the testator, and such state of mind may be shown by his statements and declarations.[5]

**6. SAME—EVIDENCE—REMOTENESS.**

Evidence of incidents claimed to show the exercise of undue influence by the second wife both before and after her marriage to testator, *held*, insufficient, where testator's love for his daughter continued long after the second marriage and long after the acts complained of, and his change of feeling toward her, and his reason for not providing for her in the will, can be traced to other causes.[6]

**7. SAME—EVIDENCE—WEIGHT OF EVIDENCE FOR JURY.**

While the weight of testimony by testator's first wife that he confessed to her, after making his will disinheriting his daughter, that he had wronged her and the daughter and hoped they would get their rights, was for the jury upon the state of his mind and as serving to connect ancient declarations with later frustrated desires, if true, yet it cannot be said to be controlling, in view of the fact that it occurred 30 years after his divorce from the witness, and was followed by his making of a codicil to his will repeating his intention of disinheriting his daughter.[7]

---

[2]Wills, 40 Cyc. p. 1155; [3]Id., 40 Cyc. pp. 1057, 1146; [4]Id., 40 Cyc. p. 1157; [5]Id., 40 Cyc. p. 1159; [6]Id., 40 Cyc. p. 1165; [7]Id., 40 Cyc. pp. 1168, 1332.

8. SAME—MENTAL INCOMPETENCY.

Testimony that while testator was in the hospital, at the time the codicil was executed, he kissed his male nurse and had him sleep with him, while out of the normal, was for the jury, and its finding that he was mentally competent is conclusive.[8]

9. SAME—"NATURAL JUSTICE" RULE NOT APPLICABLE TO ADULT CHILD CAPABLE OF SELF SUPPORT.

In the contest of a will by a daughter who was disinherited by her father, where the daughter is an adult, well educated and capable of caring for herself, the rule permitting consideration of natural justice is not applicable, and therefore the admission of testimony as to her earnings and her financial condition and that of her father, as bearing upon said question, was error.[9]

10. SAME—WHEN "NATURAL JUSTICE" RULE APPLICABLE.

That a will is contrary to natural justice, may be considered in a proper case, where the meaning of the term is properly defined.[10]

11. SAME.

A father may disinherit his child, and the child may not be heard to say that said act is contrary to natural justice, except the child be so helpless because of tender age or mental or physical infirmity that no father, except his mind be perverted, would do so.[11]

12. SAME—CHILD NOT CO-OWNER OF FATHER'S ESTATE.

The law no longer considers the child a co-owner of any part of the father's estate, but leaves division and right of participation to the dispensation of the father.[12]

13. SAME—UNDUE INFLUENCE NOT SHOWN BY DESIRE OF TESTATOR'S WIFE FOR PROPERTY.

That testator's second wife wanted him to make a will leaving the property to her and her son and disinheriting his daughter by his first wife, and even urged him to do so, furnishes no reason for invalidating it on the ground of undue influence.[13]

14. SAME—INFERENCE OF UNDUE INFLUENCE BY WIFE NOT DRAWN FROM OPPORTUNITY ALONE.

An inference that testator's wife used undue influence upon him in making his will disinheriting his daughter

---

[8]Wills, 40 Cyc. pp. 1331, 1358; [9]Id., 40 Cyc. pp. 1160; [10]Id., 40 Cyc. p. 1160; [11]Id., 40 Cyc. p. 1167; [12]Id., 40 Cyc. p. 1057; [13]Id., 40 Cyc. p. 1147.

will not be drawn from the fact that she had opportunity to do so.[14]

**15. SAME—WILL VALID UNLESS TESTATOR DOMINATED BY WILL OF ANOTHER.**

Unless some dominance, coercion, or fraud was exercised or perpetrated, a will disinheriting an adult daughter must stand, and will withstand an appeal that it is contrary to "natural justice."[15]

**16. SAME—UNDUE INFLUENCE MUST BE ESTABLISHED.**

Undue influence may not rest upon furbished declarations of the testator alone, isolated from accompanying facts and circumstances, but must be established by evidence showing that his purported will was but a farce in that it speaks the dominating will or nefarious desires of another.[16]

Error to Kalamazoo; Weimer (George V.), J. Submitted December 9, 1924. (Docket No. 153.) Decided April 24, 1925. Rehearing denied June 18, 1925.

Lucille D. Allen presented for probate the last will of Oscar M. Allen, Jr., deceased. The will was allowed in the probate court, and Madge M. Allen appealed to the circuit court. Judgment for contestant. Proponent brings error. Reversed, and judgment ordered entered for proponent.

*Harry C. Howard* and *Stuart E. Knappen,* for appellant.

*Jackson, Fitzgerald & Dalm,* for appellee.

WIEST, J. This is a will contest, in which a daughter by a first marriage attacks her father's will and codicil, on the grounds of mental incompetency and undue influence. The jury found testator mentally competent, but the will and codicil were the result of undue influence exercised by proponent, the second

---

[14]Wills, 40 Cyc. p. 1151; [15]Id., 40 Cyc. p. 1167; [16]Id., 40 Cyc. pp. 1144, 1164, 1168.

wife, with whom testator had lived 28 years at the time the will was executed, 31 years at the date of the codicil, and to whom she bore a son, who was 12 years old at the date of the will. At the close of contestant's proofs, proponent moved for a verdict sustaining the will, renewed the motion at the conclusion of the trial, after verdict asked for judgment *non obstante veredicto* and also moved for a new trial. These motions were all denied. The case is here by writ of error sued out by proponent.

Some questions, touching rulings on evidence, will be considered in the course of this opinion, but the main point is whether judgment should have allowed the will. In disposing of the motions for judgment notwithstanding the verdict and for a new trial the trial judge stated:

"Frankly, I think the jury might justly and properly have reached a different verdict than they did as to the will, at least as to the will."

In the will, executed in 1917, testator devised all of his estate to his wife and son, making no mention of contestant, but in the codicil, executed solely for such purpose, in 1920, he mentioned her as follows:

"Whereas, in my last will and testament, no mention was made by me of my daughter by my first marriage, Madge Allen:

"Now, therefore, in order that it may be understood that when I executed said will and also at this time, I have not forgotten the said Madge Allen, I do hereby purposely exclude the said Madge Allen from any interest in my property and estate under my will and I now mention her to evidence my purpose not to make any provision or devise any of my property and estate to her, feeling that I am under no obligation so to do."

The will was prepared by the late Alfred J. Mills, an attorney of high standing, under directions given by testator in person, and executed in the office of the

attorney, proponent not being present.    The codicil was also prepared by Judge Mills, but was executed while testator was in an hospital.

Madge Allen, contestant, was born August 31, 1879, and was 38 years of age when the will was executed and 41 at the date of the codicil.    She is well educated, having for many years attended boarding schools, and has musical ability.    In 1887 testator and Madge's mother were divorced, and in 1889 testator married Lucille Dixon, his stenographer, with whom he lived until his death in 1920.    Incidents before the divorce in 1887 were brought into the case by contestant to show attentions paid by testator to his stenographer, and this was followed by expressions of dislike of Madge and her mother by the second wife.    This ancient subject should have been excluded.

As stated by this court in *Pierce* v. *Pierce*, 38 Mich. 412, 419:

"The domestic scandals of many years ago could have no legitimate tendency to prove any modern state of things, and could only serve to burden the case with irrelevant and discreditable details that might and evidently did prejudice the jury, but which had no tendency whatever to show influence in 1871.    The law does not confine the power of making wills to persons of blameless character, nor does it disqualify all others from being legatees.    And whatever may have been the relations of the testator and his second wife eighteen or nineteen years before his death, and whatever may have been the circumstances of their marriage, it cannot be permissible to draw inferences from them concerning a condition of things many years thereafter, which if existing at all could be proved without difficulty as an existing fact, and not a possible contingency."

For a full discussion of the subject, see *Fulton* v. *Freeland*, 219 Mo. 494, 514 (118 S. W. 12, 131 Am. St. Rep. 576).    In this case old domestic sores were

reopened, and hatred vented, after the lips, once having power of refutation, have crumbled into dust.

We may draw the inference that proponent never liked contestant and her mother, and find ourselves also having the companion inference that the dislike was not only mutual but no occasion lost to evidence its existence, and on the whole find ourselves with nothing of probative value upon the real issues involved.     In the eye of the law, a wife is not to be branded with wrongdoing if she does not love those who despitefully use her.     At the time her father and mother were divorced, Madge was eight years of age.     For many years after the divorce testator had a father's affection for Madge, schooled her, provided her with money and their relations continued pleasant. Madge never lived with her father after his second marriage.     There came a time after Madge was through school, when her father evidently thought she should turn her education and ability to account and not lean on him for her entire support, and to bring this about he stopped giving her money.     This Madge did not like, and she went to him so often, importuning him for money, that he finally refused to see her, and then she called him by telephone and visited his home trying to see him.     To show the extent to which the relations between them became strained and the length to which she was determined to go in her purpose to bring her father to terms, we give an instance: Two years before the will was executed, when Madge was 36 years of age, she went to her father's home one fall evening about 6 o'clock, rang the door bell, asked for her father, and when he would not see her, she seated herself in a chair on the porch and drummed her feet on the floor until midnight; an officer was called and even then she remained until the hired man turned the garden hose on her.     She says she kept her feet going to warm them.     Walking

away would undoubtedly have served the same purpose.    The next day an officer visited testator to make inquiry about the act of the hired man and testator assumed full responsibility for the act.

The reason why testator became vexed with contestant is clearly traceable to her annoying importunities for money after he thought she was capable of caring for herself.    Testator needed no spurring by proponent to carry his resentment of contestant's conduct into his will.    If this was the reason for leaving her out of his will his act must stand.    But contestant and her mother testified to statements they claim were made by testator indicating a desire on his part to help his daughter but he was not at liberty to do so because it made trouble between himself and proponent.    These statements and others made by testator, relative to acts and utterances of proponent adverse to contestant, did not constitute proof of what he so stated.    *In re Morris' Estate,* 228 Mich. 555; *Zibble* v. *Zibble,* 131 Mich. 655; *In re Provin's Estate,* 161 Mich. 28; *In re Walter's Estate,* 224 Mich. 211.

The exercise of undue influence must be established by testimony wholly independent of statements or declarations of the testator.    When undue influence is shown to have been exercised, its effect may be disclosed by the state of mind of the testator and such state of mind may be shown by his statements and declarations.    Counsel for contestant recognize this rule and the trial judge specifically instructed the jury with reference thereto.

To evidence undue influence, and the dominating character of proponent and the yielding nature of testator and his subservience, events of 30 years' standing were brought forth, some even antedating the marriage in 1889.    It was claimed that, when proponent was testator's stenographer, Madge went to her father's office to ask for some money to have her

bicycle repaired, and proponent prevented her getting it. This incident was too remote and too picayunish to merit consideration. The claim that testator while carrying a bag of bananas to the stenographer refused Madge one was too ancient to even be interesting. To evidence the operation of undue influence, furtive kindnesses by the father to the daughter were shown and his expressed desire to have knowledge thereof kept from his wife. Testator's love for contestant survived his second marriage and continued until contestant was through school and capable of self-support. The testimony is too voluminous to be reviewed in detail; it has been read and measured for what it is worth, and is not persuasive of the result reached by the jury.

The change of feeling on the part of testator toward contestant, and the reasons for the same, came long after most of the acts, declarations and statements relied on, and the evidence clearly discloses good reasons for the will wholly apart from any sinister dominance of proponent. Of course, the testimony of the first wife that testator visited her at Dowagiac after making the will and confessed he had wronged her and contestant and hoped they would get their rights, was for the jury, upon the state of his mind, and served as the link connecting the ancient declarations with later frustrated desires, if true. We do not know what weight was given this testimony by the jury, but in our weighing it does not tip the scales to any great extent. This alleged visit and conversation was about 30 years after the divorce between the witness and testator; a divorce procured by testator on the ground of desertion of the witness, and was followed by a renewed fiat by testator in the codicil that contestant should have no part of his estate.

But it is said that at the time the codicil was executed testator was in an hospital, friends were ex-

cluded at the mandate of proponent, and he was so weak mentally that he kissed his male nurse and had him sleep with him.    Of course, this kissing and bed fellow sleeping was out of the normal, and the inference is urged that testator was mentally incompetent.    But the jury found him mentally competent. We do not discover the exclusion of any person who should have been admitted.

Contestant was permitted to show what her earnings were for several years before the death of her father, under the claim that "the condition of this woman and her financial strait and the condition of her father are questions of fact for this jury upon the natural justice of the will."    This was improper and highly prejudicial and should have been kept out of the case.    Contestant was not a mental or physical unfortunate, or of tender years, but an educated woman, of mature years and fully capable of caring for herself.    The rule permitting consideration of natural justice does not at all apply to this case. Counsel for proponent claim:

"Under the circumstances shown by the record in this case, the fact that Madge was cut off by the will is no possible evidence of undue influence.    She had been thoroughly educated and brought to the point where she was or should have been, self-supporting at the age of 21."

Such is the case.

That a will is contrary to natural justice may be considered in a proper case.    The right has been recognized by this court.    See *Rivard* v. *Rivard,* 109 Mich. 98, 118 (63 Am. St. Rep. 566) ; *Pritchard* v. *Hutton,* 187 Mich. 346; *In re Fay's Estate,* 197 Mich. 675; *In re Marx's Estate,* 201 Mich. 504; *In re Murray's Estate,* 219 Mich. 70.    But there are limitations to such consideration, as we shall point out.    A general right to consider whether a will offends against

230—Mich.—38.

natural justice, without defining what is meant by the term, releases all brakes and permits the jury to run wild.

This was well stated in *Waters* v. *Waters*, 222 Ill. 26 (78 N. E. 1, 113 Am. St. Rep. 359):

"In *Freeman* v. *Easly*, 117 Ill. 317, 322 (7 N. E. 656), we said:

" 'It accords with common observation that in contests concerning wills, where the testator has made, or has seemingly made, an unequal or inequitable disposition of his property among those occupying the same relation to him by consanguinity or otherwise, there is a disposition in most minds to seek for a cause for holding the will invalid. The inclination in this direction, that is found to exist in the minds of most, if not all, jurors, cannot always be controlled by instructing them there is no law requiring a testator, nor is he bound, to devise his property equitably or in equal proportions among his heirs. Of course, the law is he may make such disposition of his property as he sees fit, and he may bestow his bounty where he wishes, either upon his heirs or others. While this is undoubtedly the law, the common mind is disinclined to recognize it, and jurors will too frequently seize upon any pretext for finding a verdict in accordance with what they regard as natural justice.' * * *

"The fact that there is inequality in the distribution of the property of a testator or testatrix, cannot of itself have the effect of invalidating the will. *Graham* v. *Deuterman*, 206 Ill. 378 (69 N. E. 237). Moreover, where the testator or testatrix assigns a substantial and sufficient reason for such inequality, that reason must be accepted as true when there is no evidence in the record tending to disprove it."

This idea of natural justice is strongly ingrained and ever ready to pass upon the acts of others. It has its place and employment but it is not of general application. Its origin is traceable to the earliest history of the common law and back of that to the civil law.

Glanville, writing in the twelfth century, said:

"When, therefore, any one being indisposed wishes

to make his will, if he be not involved in debt, all his moveables should be divided into three equal parts; of which one belongs to his heir (children), another to his wife, and the third is reserved to himself. Of this third, he has the free power of disposing." Glanville, Book 7, chap. 5.

We are aware of the controversy over whether this was a law or a custom, but even if the latter it had the force of law, for the parts to the wife and children were called their "reasonable parts" and were recoverable by the writ *de rationabili parte bonorum.*" This law or custom, so far as it related to children, has been obsolete so long that it is but a curiosity in legal annals, but the attempt to call up its spirit and have a jury instead of the old writ apportion a reasonable part of the estate under the guise of natural justice seems to survive.

Gai in his Institutiones Juris Civilis of the second century, Com. 2, De·Exheredatione Liberorum, stated:

"Moreover, a testator who has a son in his power must take care either to institute him heir or to disinherit him individually, for passing him over in silence invalidates the will."

And Edward Poste in his Translation and Commentary on Gai states:

"If a child was disinherited without a cause, or received less than one-fourth, either as heir or legatee, of what his share would have been by intestate descent (*portio legitima*), he could by impeaching the will as immoral or unnatural (*querela inofficiosi testamenti*) have it set aside on the fictitious presumption of the testator's insanity. The presumption, at least, was so far fictitious that it was not allowed to be rebutted by any other proof of his sanity except proof of the adequacy of the motives for which the child was disinherited."

A father may disinherit his children and the children may not be heard to say that his act in doing so is contrary to natural justice; except in case a child be

so helpless because of tender age or mental or physical infirmity that no father, except his mind be perverted, would so far forget parental affection or lose sight of duty, saying nothing about pity, as to send his estate entirely away from such an one.   In such a case the law still permits consideration of natural justice, in connection with justifying evidence, on the theory that some cause imagined, some coercion by or dominance of another, or want of mental capacity to recognize the common dictates of humanity brought forth such an unnatural will.   But in case of a son or daughter of mature years, capable of self-support, no such theory is admissible, and the plea of natural justice may not be indulged.

The law no longer considers the child a co-owner with the father of any part of the father's estate and leaves division and right of participation to the dispensation of the father, believing that in this day and age he will be moved by parental affection and sense of duty to provide for the helpless who have righteous call upon his bounty.   Others have no appeal except to his bounty.

We may assume that proponent wanted this will made and even urged testator to give nothing to contestant and have no reason for invalidating his compliance with her desire.

We pass with scant notice the fact the wife had opportunity to exercise undue influence over her husband and decline to draw any inference therefrom against the will.   Such an inference, if drawn, would subject the relation to one of the meanest and most despicable of suspicions, and the more firmly knit and amicable the relation the stronger would come the miserable suspicion, which leaves out the steadying consideration that it is the legal and moral right of a wife to urge and persuade a husband to provide for her in the event of his death.

Unless some dominance, coercion or fraud was exercised or perpetrated the will must stand, and will withstand an appeal to a jury that it is contrary to "natural justice." The testator had a right to choose the objects of his bounty and no jury may review the equity of his determination. He had a right to give his entire estate to his wife and son and disinherit his daughter, if it was his will to do so, and no jury or court may hold inquest on disposition so made, except it is made to appear by a preponderance of evidence that it was not his will to do so. Undue influence may not rest upon furbished declarations of the testator alone, isolated from accompanying facts and circumstances, but must be established by evidence showing that his purported will was but a farce in that it speaks the dominating will or nefarious desires of another. This man was mentally competent to make the will and codicil; so found by the jury and clearly so under the evidence. He was not a weakling but a man of affairs and wide business experience and, until on his death bed, managed his affairs. Under the evidence the jury should have been instructed to find in favor of proponent.

The judgment is reversed and the circuit court directed to enter judgment in favor of proponent. Proponent will recover costs.

McDONALD, C. J., and CLARK, BIRD, SHARPE, MOORE, STEERE, and FELLOWS, JJ., concurred.