## *In re* BULTHUIS' ESTATE.

### BULTHUIS *v.* BULTHUIS.

1. WILLS — UNDUE INFLUENCE NOT ESTABLISHED BY MERE OPPORTUNITY.

   While undue influence in making a will is not usually exercised openly and may be inferred from the facts and circumstances surrounding the testator, including opportunity for the beneficiary to exercise it, yet there must be more than mere opportunity, unequal distribution of property or previous statement by the testator as to intended disposition of his estate from which the will departs, to constitute undue influence.[1]

2. SAME—MOTHER UNDER NO OBLIGATION TO LEAVE PROPERTY TO HER ADULT CHILDREN.

   A mother is under no legal or moral obligation to leave any of her property to any one of her adult children, who are all in comfortable circumstances, but she may make such disposition of it as she sees fit.[2]

3. SAME—UNDUE INFLUENCE—EVIDENCE—SUFFICIENCY.

   In proceedings by a son and daughter to contest their mother's will leaving the bulk of the property to another son, evidence *held*, insufficient to establish that deceased's free agency was destroyed to the point where she was under such restraint and compulsion that the will was not as she desired it to be.[3]

Error to Muskegon; Vanderwerp (John), J.    Submitted January 14, 1925.    (Docket No. 86.)    Decided October 1, 1925.

Henry Bulthuis presented for probate the last will of Jantje Bulthuis, deceased. The will was allowed in the probate court, and Ryan Bulthuis and another appealed to the circuit court. Judgment for contestants. Proponent brings error. Reversed.

[1]Wills, 40 Cyc. pp. 1145, 1164, 1166, 1167, 1168; [2]Id., 40 Cyc. p. 1057; [3]Id., 40 Cyc. p. 1165.

On effect of unnatural testamentary disposition on question of undue influence, see notes in 6 L. R. A. (N. S.) 202; 22 L. R. A. (N. S.) 1024.

*Stephen H. Clink,* for appellant.

*Cross, Foote & Sessions,* for appellees.

STEERE, J.   Jantje Bulthuis, a widow about 73 years of age, died on March 17, 1923, in the city of Muskegon, leaving a last will and testament, dated September 11, 1922, disposing of her estate consisting of real and personal property in said city valued according to the probate inventory at about $11,000.   She was survived by two sons and one daughter, all of middle age and married, and the children of a deceased daughter who are not mentioned in her will.   Plaintiff Henry Bulthuis is her youngest son, who was named executor of her will.   Defendants Ryan Bulthuis and Pauline B. Schutter are her daughter and other son and contestants of her will.   They first unsuccessfully contested the will in the probate court. On their appeal to the circuit court the case was tried by a jury and the will held invalid, from which plaintiff has appealed to this court by writ of error.

In taking their appeal to the circuit court defendants allege as grounds of invalidity mental incompetency on the part of testatrix, and undue influence.   During the trial they abandoned the claim that their mother was of "unsound mind and disposing memory," and the case was submitted to the jury on the issue of undue influence.

Deceased and her husband were of Holland nationality and lived in Muskegon for many years, during which time they had raised a family and accumulated some property which, so far as shown, became hers when he died on May 30, 1921.   Plaintiff and defendants were then "grown up a long time ago," had long since left their parental home, married and were living in homes of their own with their families.   Mrs. Schutter testified that she was 39 years old and the youngest of the family.   The ages of her two brothers

Ryan and Henry were not shown, but Ryan testified he was the oldest of the three, and incidentally admitted that his brother and sister "probably aren't fixed quite as well as I am." Ryan had a disagreement with his father some time before the latter's death, how long is not disclosed, which resulted in an estrangement between them continuing during the remainder of his father's life.

Deceased made two wills before the one at issue here, the first not long after her husband's death while she was yet living alone in their old home. In that will Ryan was left one dollar. The second was made after her daughter, Pauline, and her husband were living with deceased in the old home. In that will she also left Ryan but one dollar. The will involved here was made while she was living with her son Henry, because of whose undue influence it is claimed to be void. In this she left Ryan a half interest with his sister in the old family homestead.

The only direct testimony of anything ever said by Henry which could be construed as an attempt to influence his mother in making her will is that of his sister, Pauline, who testified bitterly against Henry in various particulars. She asserted that he told their mother how to make her second will, and the last. When asked if she ever heard anybody tell her mother how to make a will she said:

"Yes; sir; I heard Henry tell her when the first will was made. He was running down Ryan. He and Henry and Mr. Schutter and the boy, we was all there. He told mother before you come, 'This will is not the way father wanted it.' "

Of an occasion while deceased was living with Pauline and her husband, and expressed a desire to make a new will dividing her property more equally between her children and leaving Ryan part of it, she said:

"To my mind Henry influenced her not to do it, because there were times he would come over and tell her right in the presence of me and Mr. Schutter, 'Don't you do it, wait until you die and then we can give Ryan a little.'"

In her third will, made while deceased was living at Henry's home and under his influence, as Pauline claimed, she acted directly contrary to that advice, if given, and left Ryan an undivided half interest in the old homestead. At the time of her husband's death deceased was left alone in their old home and Henry was the only one of her children so far as shown who offered her a home with them. Pauline imputed a sinister motive to this offer and cautioned her mother against it as follows:

"I said 'Mother, watch out what you do, you have lived thirty-eight years in that place, as old as I am, and now be careful what you do,'"—suggesting that she go with Henry a few days and see if she liked the neighbors.

Deceased then went home with Henry but in a few days had him take her to Pauline's house where she stayed a short time and then went to her own place, saying, "Pa told me never to leave my old home." After living there alone for five or six months she made an agreement with Pauline and her husband to move there and be with her, or she with them. She paid them for her board. They stored her furniture upstairs as it was not so good as they had and out of date, and used their own. Henry occasionally visited his mother there and was apparently not a very welcome guest to his sister and her husband, because of his conduct, as she related. She complained of his "raising trouble" from the start, particularly featuring his asking his mother for certain household effects. Her testimony is tuned with reminiscences and accusations of the following type:

"Henry and his wife was doing the grabbing, * * * When we wasn't even living with mother yet he wanted a lawn mower that father used to use. It was a one-wheeled little lawn mower. I told mother, 'It is funny; it seems if father wanted him to have it why didn't father give it to him?' From that time on he asked for some of the household goods that belonged to mother, * * * and then mother went over to visit over to Henry's house and when mother came back mother said Henry's wife said to her 'Why can't we have the coal stove?' I said, 'They want to see you die.' That is the words I said to mother. * * * We had trouble, but it was always caused by Henry. He would want different things and I thought, 'Mother isn't even dead' "—

Pauline and her husband went on a visit to Montague the latter part of July, 1921, and left their boy at home with deceased, who, Pauline said, "could get around and cook things" and to whom "it was all agreeable." While they were absent Henry called to see his mother, but once as he states. A neighbor called by plaintiffs testified he saw him go there oftener but could not tell how many times. This witness stated he had no knowledge of any one exercising any influence over deceased in making her will. Of their return from Montague and her mother going to live with Henry, Pauline testified:

"When we got home mother seemed to be happy, but I noticed she didn't act like she did when we went away, and the first thing I said, 'Mother, was you lonesome when we was gone?' She said, 'No.' It was Saturday at 11 o'clock when we come in and we noticed she acted strangely. I said, 'Mother, don't you feel well?' She said 'Yes.' On Sunday morning I said to her, 'You didn't even sweep the kitchen floor; here it is Sunday and all the work is left for me.' That is the only disagreement I had with her, but she seemed to be all right all day Sunday, and Monday in the afternoon she said, 'I guess I will go over to Henry,' and we thought she was just going there for a visit. I said, 'You had better wait and go in the morning;

and then it was on Tuesday and I was busy ironing and there to my surprise in the bed room she had pillow cases and everything out that she was going to take over. I said, 'What are you going to do?' She said, 'I am going over to Henry.' That was the first day of August. Then all she took with her was a few pillow cases and some of the clothes, and on the 10th day of August at 8 o'clock in the morning there come Henry and his wife and mother with an express cart and a great big trunk. Mother said 'Good morning' to me. I said, 'So you intend to leave, do you?' I said to Henry and his wife, 'You have got just exactly what you have been looking for; as long as we have been living with mother you have been looking for this.' "

Later Henry went there with his mother to get some more of her effects; they were met at the door with the mixed welcome that deceased could come in but Henry had "got to keep out." Pauline's husband stood guard against Henry and an exchange of uncomplimentary views between them led into Schutter's going "after him." Schutter's son was sent for Ryan who, on being told by the boy that they were fighting over there and he was wanted, says:

"I run over and my brother-in-law had him down in front of the house. My mother was standing there, and I said, 'Mother, what did you take him along with you for? Why didn't you come to me and I would have gotten you with the car and taken your stuff back with you and I would have taken you back home and there wouldn't have been any trouble.' I said, 'Come on in the house and get what you want and let's talk this thing over. The neighbors will be thinking pretty soon that this is getting pretty terrible.' So I went in the house with her. I took her by the arm and led her in the house and she sat down and she started to cry. I said, 'What is the matter, ma?' She said, 'It is trouble, trouble all the time,' she said, 'they are skinning me alive now, I can't do as I want to, I have got to do this and I have got to do that or I am kicked out, I can't stand it,' she said. 'Well,' I said, 'What is the matter; what do you want?' She

said, 'You know, Ryan, what I told you in July, how I wanted this. Now,' she said, 'I have had to make another will again, since I talked with you in July, but, Ryan, you know what I want; I want my children all to share equal, and I don't know what to do.' "

This testimony in connection with the proof of opportunity, viewed in the light of other shown facts in the case, is especially urged for defendants. Henry is not shown to have been mentioned during that conversation. She did not say that *he* was but that *they* were skinning her alive. The only proof approximating any one being "kicked out" was what befell Henry when he went with his mother on a peaceable mission to get some of her own personal property from her own house. When that event was terminated by Ryan, Henry was down, if not out. Ryan had been estranged from his father and thereby to a degree, as the testimony fairly indicates, from the rest of the family. Though not shown to have been unfriendly towards his mother or sister and brother, he did not visit his home or parents following the estrangement during the remainder of his father's life, and seldom visited any of them thereafter. His knowledge of their family affairs was most of it pure hearsay. He tells of once being called by his mother to come to the old home as she wanted to talk over matters there and she then told him in the presence of Pauline and her husband that she wanted to change her former will and divide her property more equally between her children and leave to each one of the three houses she owned; that they talked the matter over for a while and he then asked her when she wanted that done, to which she replied, "Just as soon as you can." He answered that he was "kind of busy just now" and suggested that it be put off until "we will be back from the lake" the latter part of August or the first of September, to which she assented, but when they got back from the lake in September Henry

had got her over to his house. The next time he tells of going to the old home was when he was called over there to stop a fight between his brother and brother-in-law staged in front of the house in the presence of his mother.

From his knowledge of his mother he expressed the opinion that she was easily influenced and summed up his views in part by saying:

"I don't claim she was insane or irrational or anything like that. * * * She knew enough to know what she wanted to do. * * * What I think is, that somebody influenced her to do something she otherwise would not have done."

One thing she did do which she had not before done was to leave him a half interest in the old home by her last will.

When deceased died her estate as inventoried consisted of cash in bank $1,424.55, a mortgage of $303.03, currency in the house $55, some household effects appraised at $10, and three houses and lots appraised at $9,200, the old homestead at 42 Delaware street being valued at $3,000. By the will involved here she left $200 to her grandson, Harold, son of her daughter, Pauline, her old home at 42 East Delaware street to her son Ryan and daughter, Pauline, in equal parts, and the balance of her estate to her son Henry. The unfairness of the will seems to have been sounded in the case, by defendants' witnesses at least, as indicating undue influence. It is true such influence is not usually exercised openly and may be inferred from the facts and circumstances surrounding the testator, including opportunity for the beneficiary to exercise it. But there must be more than mere opportunity, unequal distribution of property or previous statement by the testator as to intended disposition of his estate from which the will departs, to constitute undue influence. *In re Haslick's Estate*, 195

Mich. 432 (Ann. Cas. 1918D, 466); *In re Fay's Estate*, 197 Mich. 675; *In re Carlson's Estate*, 218 Mich. 262; *In re Allen's Estate*, 230 Mich. 584.

Discarding Henry's direct denial of having ever attempted to direct or persuade his mother in making her will and other issues raised as to surrounding facts and circumstances by conflicting testimony, defendants' claims rest unduly on suspicions rather than substantial proof. The fact that Henry invited his mother to go to his home after her husband's funeral and live with him and her doing so could scarcely be called even a suspicious circumstance. He took her to his sister's home when she wanted to leave his place for her old home, and after his sister and family moved there to live with her, he visited her occasionally. His calling upon her when she was left there alone with the boy while they went on a visit was not strange nor unnatural. Neither is it altogether strange that she left there for Henry's home after Pauline returned and had a "disagreement" with her over her housekeeping while they were away, and complained that she "didn't even sweep the kitchen floor * * * and all the work is left to me." What she said to Ryan when he escorted her into her own house after Henry's efforts in that direction had resulted disastrously was not, even if as he states, proof of undue influence, but is only admissible to show her state of mind resulting from undue influence of which there is other substantive proof. Henry was not present when she tearfully told Ryan of her troubles and desires on the evening of the hostilities in her front yard between her son and son-in-law. When that talk took place she was in her own house with defendants, who were agreeable to what they say she wanted to do. There was nothing to prevent her remaining there and making another will disposing of her estate in any manner she desired. Yet she

left of her own accord and went back to Henry's home. They had with them that evening a boy's cart borrowed by Henry from a neighbor, in which to take back the articles of her personal property which deceased wanted.    She returned it not long thereafter.    The neighbor, who had known her for years, said he never heard her say anything to indicate she did not know just what she was talking about, that he knew they went over there to get some goods and in their talk she said "they had better watch out," also "that she had better watch out."    He supposed she referred to Pauline.

"*Q.* All you can tell us is that she made the remark that one of them had better watch out?
"*A.* Yes, sir.
"*Q.* This was some days after Henry had borrowed the cart?
"*A.* Yes, sir."

It is significant that so far as shown her three wills were all made on her own initiative.    They were drawn by an old experienced attorney of her own choosing, for whom she sent on each occasion.    He had long lived in Muskegon and formerly been judge of that circuit.    He testified of the last occasion that Henry told him she wanted to see him and he went to the house to see what she wanted.    No one was listening when he interviewed her because, as he said, "I took particular pains to talk with her when she could tell me just what she wanted to without any interference, the same as I would in any case.    *    *    *    I was particularly careful about that, in view of the making of the other will."    He then went back to his office and prepared the will in accordance with what she said to him, as he believed, had it written out on a typewriter and returned to her with it, read it over to her, made one change on her suggestion, with a pen, which he pointed out when identifying the instrument.

The will was then duly executed, the attorney taking it with him for safe keeping as he recollected.

Deceased was under no legal or moral obligations to leave any of her property to any one of the parties to this action. They were adults of middle age, living their own lives with their families in their own homes, apparently in comfortable circumstances. No ill health or other misfortunes are shown to have befallen any of them especially appealing to her bounty. She could make such disposition of it as she saw fit. She had the legal right to bestow her bounty where and as she desired, to favorites in her own family or to others. No question is raised as to her mental competency to do so. The only direct evidence of any effort by Henry to influence her in making her will contrary to her wishes was disregarded by her when she made this will while living in his home. The circumstances shown do not in our opinion have inferential probative force beyond mere suspicion. They furnish no legal basis for an ultimate inference that deceased's free agency was destroyed to the point where she was under such restraint and compulsion that it can be found by a preponderance of evidence this will was not dictated by her as she of her own will concluded she desired it to be.

The judgment is reversed, with costs to appellant, and a new trial granted.

McDONALD, C. J., and CLARK, BIRD, SHARPE, MOORE, FELLOWS, and WIEST, JJ., concurred.