*In re* SPINNER'S ESTATE.

SPINNER *v.* SULLIVAN.

1. WILLS—MENTAL COMPETENCY—EVIDENCE—SUFFICIENCY.
    In will contest case, as against physical fact that testator actually made will which was his own handiwork and which demonstrated mental competency, lay and medical testimony *held,* insufficient to raise issue of fact on question of mental competency.

2. EVIDENCE—UNDUE INFLUENCE—ADMISSIONS—ADMISSIBILITY.
    In will contest case, admissions of one of several legatees are not admissible to show undue influence.

3. WILLS—STATEMENTS OF TESTATOR'S WIFE INSUFFICIENT TO SHOW UNDUE INFLUENCE.
    Statements of testator's wife tending to show that she consulted with and advised him in terms of will, standing alone, would not make case of undue influence.

4. SAME—MERE OPPORTUNITY INSUFFICIENT TO SHOW UNDUE INFLUENCE.
    To make case of undue influence, there must be evidence of acts and circumstances from which jury may fairly infer that mind of testator was overcome; mere opportunity to exercise influence and unequal distribution of estate not being sufficient.

5. SAME—RULE OF NATURAL JUSTICE.
    Rule of natural justice, *held,* neither invoked by counsel nor supported by testimony.

6. SAME—UNDUE INFLUENCE NOT SHOWN.
    Will *held,* to clearly reflect mind of testator, and that testimony is insufficient to show undue influence.

7. SAME—EVIDENCE—DECLARATIONS OF TESTATOR.
    Declarations of testator are not evidence of undue influence.

8. SAME—BURDEN OF PROOF.
    In will contest case, burden of proof is on contestants.

On the question as to burden of proof in respect to wills, see annotation in 36 L. R. A. 737.

On admissibility of ante-testamentary declarations of testator as evidence of undue influence, see annotation in 3 L. R. A. (N. S.) 749.

9. SAME—UNDUE INFLUENCE—DIRECTED VERDICT.
  Where contestants produced no evidence of acts or circumstances showing exercise of undue influence on testator, there was no question of fact for jury.

10. APPEAL AND ERROR—ASSIGNMENTS NOT ARGUED NOT CONSIDERED.
  Assignments of error in brief as to admission and rejection of testimony, in support of which no argument was offered, on appeal, will not be considered.

Error to Bay; Houghton (Samuel G.), J. Submitted June 18, 1929. (Docket No. 68 Calendar No. 34,038.) Decided October 7, 1929.

Ida E. Spinner and Arthur F. Spinner presented for probate the last will of Joseph Walter Spinner, deceased. From an order granting administration of the estate to the petitioners, Lucy Spinner Sullivan and other heirs appealed to the circuit court. Judgment for proponents on a directed verdict. Contestants bring error. Affirmed.

*Gilbert W. Hand* and *Carl H. Smith,* for proponents.

*Mark W. Goodwin* and *Catherine Herlehy* (*Kinnane & Leibrand,* of counsel), for contestants.

FEAD, J. This is a will contest in which contestants claimed incompetency and undue influence, and the court directed a verdict sustaining the will.

Joseph Spinner was an ash dealer in Bay City. He was married three times. On May 16, 1926, his second wife died, leaving surviving 11 adult children, one of whom later died, leaving contestant Illah Garlock as her sole heir. In January, 1927, he married proponent Ida E. Spinner. On October 6, 1927, at the age of 77, he executed the will, and died April 20, 1928.

The will made bequests to the children, of $1.00 to Carrie Garlock, mother of Illah; $1.00 to Cyril, with recitation that testator had provided for him in his lifetime; $1.00 to Walter, who had once engaged in business in competition with his father; $50 to Gertrude, the youngest daughter; $100 each to Lucy and Joseph; $500 each to Margaret, Frederick, and Ida (daughter); $1,500 to Myra, who had been more or less of an invalid for some years but was able to work; the household furniture and all the money in the bank to the wife Ida, she to pay the funeral expenses; the real estate to the wife Ida and testator's son Arthur, Ida to have the rents until the estate was closed or the property sold; the residue equally to the wife Ida and Arthur. The will further declared that the wife's legacies were in lieu of dower; that none of the children had any claims against testator, and if any were presented and allowed they should be deducted from the respective legacies; that one Dr. Lawrence had no claim against him for services performed for Myra after she became of age and mention was made of it because the doctor had presented a bill and testator had repudiated it; gave directions to the executors to pay a loan, upon which he had become surety at a bank, to enable Margaret and her husband to buy a home, and instructed them to take over the property if the loan was not paid; cautioned the executors against selling real estate at a sacrifice; directed legacies to be paid out of moneys available and especially that they be paid to those in need; appointed Arthur and Ida executors. The testimony did not show the value of the estate, except that it was substantially over $25,000.

The will was drafted by Robert L. King, an attorney of 25 years' practice, who had known testator

over 30 years. It was witnessed by an acquaintance of 50 years. Testator went alone to Mr. King's office, at times consulted some notes of memoranda which he had, gave the details of the will, himself suggested the point that the wife should not have both dower and legacies, gave all the provisions embodied in the instrument without suggestion, Mr. King took notes, testator went away, returned alone in two days and executed the will.

Mr. Spinner continued active in the ash business until a day or two before his death, although Cyril, who had assisted him for years, had left him some months before and he had to hire strangers. About the time the will was made, he had full grasp of a transaction in which Myra assigned to him certain insurance policies, indorsed a note for Joseph at a bank, made regular and timely payments on a land contract, was treated by a physician who noticed no mental incompetency, and, in January following, defended a suit brought by Dr. Lawrence for services to Myra, in which testator testified clearly and connectedly. His memory in business affairs was excellent.

The lay evidence relied on to show mental incompetency came from the children. Most of it was quite remote, dating before the death of the second wife. A number of peculiarities and idiosyncrasies were detailed, but the most weighty claims were that testator was unfeeling at the sickness and death of his wife, and, before she died and in her presence, spoke of getting another wife; he had been exceptionally affectionate toward his children and later changed; he accused his wife and Myra of stealing his money, Walter and Arthur of stealing lumber, his wife of opening his mail and turning orders for ashes over to Walter, and Myra of running around at night with men; he was forgetful, sometimes mis-

calling the children by name or not remembering them; in making application for war insurance after the death of one of the boys he could not remember the names and order of his children and had to obtain them from his wife; he talked and laughed to himself, was subject to fits of extreme temper and carried on wildly; after the death of his wife he became obsessed with the notion of remarriage; began a personal courtship, and, in bestowing favors on his lady, instead of saying it with flowers, said it with a set of false teeth; put Myra out of the home as he said he was going to get another woman; complained that women were chasing him and spoke disrespectfully of them; obtained names from a matrimonial paper, had his photograph taken, sent it to correspondents and wrote 15 to 20 letters per day; got in communication with Ida in this manner, went to Ohio, brought her to Michigan, and married her. About the only specific incidents occurring after the marriage to Ida were that testator refused longer to contribute to the support of Gertrude, who was living with Lucy in Detroit, and suggested that Gertrude could do the best she could or Lucy could put her out in the street; refused to pay for operations for Myra because she was of age and testator thought the doctor was charging too much, and the county paid the bills; and miscalling or not remembering his children.

Just before the marriage to Ida, Cyril began a proceeding in probate court to have testator declared an incompetent. The record is quite scant, but the cause appears to have been tried in March, 1927, some of the children testified, and the cause was dismissed when testator gave Cyril a farm in payment for labor performed by him for a number of years in the ash business. In February, 1928, the

county began a proceeding to compel testator to support Myra. He offered to support her at home. Testator also defended and finally compromised the suit by Dr. Lawrence.

The medical testimony for contestants was furnished by Dr. Jones and Dr. Lawrence. Dr. Jones had treated testator some ten years previously, answered a hypothetical question, was of the opinion that testator had paresis, and, if so, he did not have testamentary capacity. Dr. Lawrence, who had been the family physician but had not treated testator for something over a year before the will was executed, said he had a sex complex, progressive senile dementia and was not competent to make a will. It was shortly after the will was executed that Dr. Lawrence sued testator as a person *compos mentis.*

In view of the number of children; the diverse provisions made for them and the several matters covered by the will, it is not a suspicious circumstance that testator had notes of the kind of a will he wanted when he consulted his attorney. There was no showing that he did not make the notes himself. Against the physical fact that testator actually made a will which was his own handiwork and which demonstrated mental competency, the lay and medical testimony did not raise an issue of fact for the jury. The situation is in such direct accord and so fully covered by recent authority that discussion would be merely repetition. *In re Ferguson's Estate,* 239 Mich. 616; *In re Lembrich's Estate,* 243 Mich. 39; *In re Aylward's Estate,* 243 Mich. 9; *In re Stephens' Estate,* 244 Mich. 547.

The claim of undue influence rests wholly on statements said to have been made by Mrs. Spinner. Some of them were loose assertions that she was boss, made usually in controversies with daughters,

and others were made after the death of testator and were to the effect that if he had survived the last illness he would have changed the will and left all the children, or at least those living in Bay City, only $1 each. Shortly before the will was executed, in the presence of testator, Ida said the Garlocks would not get a cent of money. This might have been no more than advance information of testator's intentions as disclosed to Ida. The only statement of consequence seems to have been made after the death of testator that "I made a mistake in that other will by giving your brother Arthur half," if it may be construed as an assertion that Mrs. Spinner dominated the making of the will.

If objection had been made, these statements would have been excluded. Admissions of one of several legatees are not admissible to show undue influence. *In re Ganun's Estate,* 174 Mich. 286; *In re Shanahan's Estate,* 176 Mich. 137. Standing alone, the statements would not make a case of undue influence. They may tend to show that Mrs. Spinner consulted with and advised her husband in the terms of the will, but she had a right to do so. *In re Jackson's Estate,* 220 Mich. 565; *In re Allen's Estate,* 230 Mich. 584. To make a case of undue influence, there must be evidence of acts and circumstances from which a jury may fairly infer that the mind of the testator was overcome. *In re Ganun's Estate, supra.* Mere opportunity to exercise influence and unequal distribution of the estate are not sufficient. *In re Carlson's Estate,* 218 Mich. 262; *In re Bulthuis' Estate,* 232 Mich. 129. The rule of natural justice, in *Re Allen's Estate, supra,* was neither invoked by counsel nor supported by testimony.

Counsel for contestants have not cited authority nor pointed out evidence of acts or circumstances in support of their claim of undue influence. Although Cyril and Myra lived at home for several months after testator married Ida, and other children visited the father, there was no testimony that Ida ever interfered with or influenced testator in his business or property affairs, that she exercised any control over his personal conduct except that she once sent him out in the rain for wood, that she attempted in any way to prejudice him against or in favor of any of his children, or that she suggested any of the terms of the will. There was no testimony, aside from claimed declarations of partiality to Arthur, which would furnish a reason for diversity of provision for the children if Ida had dictated the will. The will clearly reflects the mind of testator, who had evidently carefully thought through the gifts to the children, and who must have had his own reasons for preferences. The only declarations of testator shown were that he would not give Walter more than a dollar in his will because he had engaged in competition with him, and that, just before the will was executed, Ida took a trip to Ohio and testator told Myra that Ida wanted him to do with the property as she wanted, that he had written her what he thought and he did not know whether she would return. Testator's declarations were not evidence of undue influence, *In re Morris' Estate,* 228 Mich. 555, nor do they suggest that his mind was dominated by Ida.

The burden of proof of undue influence was on contestants. As they produced no evidence of acts or circumstances showing the exercise of such influence on testator, there was no question of fact for the jury.

Contestants offered no argument in support of their claims of error in the admission and rejection of testimony, although they stated the assignments in their brief, and they will not be considered. *Walker* v. *Mack,* 129 Mich. 527; *Greenman* v. *O'Riley,* 144 Mich. 534 (115 Am. St. Rep. 466).

Judgment is affirmed.

WIEST, CLARK, McDONALD, POTTER, and SHARPE, JJ., concurred. NORTH, C. J., did not sit. The late Justice FELLOWS took no part in this decision.