## *In re* STEPHENS' ESTATE.

1. APPEAL AND ERROR—EVIDENCE—NOT REVERSIBLE ERROR TO RE-
   QUIRE EXPERT TO CONSIDER INCONSISTENT TESTIMONY IN AN-
   SWERING HYPOTHETICAL QUESTIONS.

   It was not reversible error to require an expert medical wit-
   ness, on the question of testator's mental competency, in an-
   swering a hypothetical question based on certain testimony,
   to consider testimony inconsistent therewith, given by a wit-
   ness called by the party submitting the question, since the jury
   would have to consider said testimony.

2. TRIAL—HYPOTHETICAL QUESTIONS—DISCRETION OF COURT IN PASS-
   ING ON HYPOTHETICAL QUESTIONS.

   In passing upon hypothetical questions, considerable discretion
   is vested in the trial judge, although, as a rule, counsel have
   the right to frame hypothetical questions, leaving considera-
   tion of counter facts to be presented upon cross-examination.

3. EVIDENCE—TESTIMONY OF EXPERT HAS NO PROBATIVE FORCE
   WHERE UNDISPUTED TESTIMONY NOT CONSIDERED.

   The testimony of an expert medical witness against the presump-
   tion of mental competency of testator supported by undis-
   puted acts of testator establishing mental competency, without
   consideration of such acts, had no probative force and pre-
   sented no issue for the jury.

4. WILLS—MENTAL COMPETENCY—DIRECTED VERDICT.

   Where a will was contested on the ground of the mental incom-
   petency of testator, and the evidence of his mental competency
   at the time the will was executed was undisputed except by
   claimed inferences from testimony by contestants' witnesses as
   to his conduct and speech at other times and places, mostly
   remote, together with expert medical testimony based on hy-
   pothetical questions devoid of unquestioned controlling acts
   showing mental competency, the trial judge properly directed
   a verdict allowing the will.

Error to Wayne; Miller (Guy A.), J. Submitted October 18, 1927. (Docket No. 99, Calendar No. 33,205.) Reargued October 24, 1928. Decided December 4, 1928.

Mary L. Stephens presented for probate the last will of Albert L. Stephens, deceased. On objection of Henry Stephens and others the will was certified to the circuit court. Judgment for proponent on a directed verdict. Contestants bring error. Affirmed.

*Frederic T. Harward* and *William J. Griffin,* for appellants.

*Hal L. Smith, Seward L. Merriam, George Krapfel* and *Joseph A. Vance, Jr.,* for appellee.

WIEST, J. Albert L. Stephens, aged 68, died March 23, 1926, leaving his wife, no issue, and a large estate. October 11, 1923, he executed his will, in which he remembered persons who had rendered him service, left the bulk of his estate to his wife, with whom he had lived for 16 years, and stated:

"I make no provision for the children of my deceased brother, Henry, as they are already abundantly provided for. I make no provision for the children of my deceased sister, Katherine McIver, as I have already settled with them and have turned over to them practically all interest and moneys which I should have received from the estate of my mother, Clarinda L. Stephens."

These declarations carried out the purpose he formed at the time of settlement of a bitter litigation in which contestants herein were opposed to him.

Under date of September 4, 1919, Mr. Stephens wrote in his diary:

"Finished settlement with the McIvers and H. S. rd., in full settlement of the estate of C. L. Stephens by giving them all that she ever gave me, *i. e.*, the ranch at Mission, San Jose, California, and $60,-543.61 in cash. In future, these people are nothing to me, or are they to have anything of mine at my death."

When the will was presented for probate Henry Stephens 3d, nephew, above mentioned as "H. S. rd.," gave notice of contest, alleging mental·incompetency and undue influence, and he was joined by his cousins, Stephen McIver, Stephanie McGreer, and Katherine Navone, children of testator's deceased sister, Katherine McIver. The contest was certified to the circuit court for the county of Wayne for trial. At the close of the proofs the circuit judge directed the jury to allow the will. Contestants review by writ of error, and contend that the evidence of mental incompetency presented an issue of fact for the jury.

The allegation of undue influence had no support in the proofs. No lay witness testified to facts authorizing him to express an opinion that testator was mentally incompetent when he executed the will. Did the united testimony of such witnesses, on the subject of mental incompetency of testator, authorize expert medical opinion, commanding submission to the jury? We think not. We may accept at face value all the testimony in behalf of contestants, only to find most of it too remote, much of it inconsequential, and none of it meeting the clear proof of testator's mental competency at the time the will was executed, saying nothing about the undisputed fact that testator, before making the will, and up to the time of his death, continuously managed his large business and financial affairs with certitude

and marked ability, and was the trusted adviser of individuals and great financial institutions. We need not enter upon a review of the testimony of witnesses in behalf of contestants, for the substance thereof, upon the subject of mental incompetency of testator, was stated in hypothetical questions to expert medical witnesses. One such question, and probably the most comprehensive, was as follows:

"There has been proof offered in this case, which, for the purposes of this question, you will assume to be true: That Albert L. Stephens, whose will is in question here, died March 23, 1926, aged 68 years, 4 months, and 11 days, the death certificate giving the cause of death as heart block, its duration many years; contributory causes of death, chronic valvular disease, chronic nephritis, and asthma.

"Dr. Alexander DeWitt testified that he treated him in 1918; that he saw him about a half dozen times; that he at that time had a marked *arteriosclerosis;* that he also was afflicted with cerebral *arterio-sclerosis;* that his arteries were tortuous and hard; that all of the grounds showed sclerosis of the arteries of the brain; also that there was hardness around the temples, and those arteries.   *   *   *

"That he had kidney trouble, and that his kidneys had become contracted; that owing to this, the poisons were not eliminated from the blood stream, but went on to poison the nervous system in the brain; that his heart muscle was degenerated.

"It was also testified that he indulged more or less in alcoholic drinks. His niece, Stephanie Mc-Greer, testified that in 1913, when she would go to call him to dinner, at the ranch in San Jose, she would find him wandering about the ranch. He would come in, eat his dinner, and half an hour afterwards ask when dinner was ready, seemingly not realizing that he had eaten it a short time before. That his speech was not normal at that time;

he would mumble. That in 1915 he flew into a passion at his niece Stephanie, without any cause whatsoever, although he had been, as she said, lovely to her just before. In his rage, he ordered her off the ranch. That in 1921, at the Palace hotel in San Francisco, he failed to recognize his niece Stephanie, although she said 'How do you do, Uncle Al'? That for some years previous to his death he failed to recognize acquaintances and relatives whom he had known for years.

"That in 1923 he called his nephew, Henry Stephens the 3rd, 'Fan,' when he met him in front of the Ford building. Fan was his first wife's name, who had been dead some 13 years; that his nephew was a large bulky man, wearing a full beard, and not at all effeminate in his appearance. That he was faltering in his speech; that his eyes had a glassy stare; that in 1922 at the Detroit club he failed to recognize his nephew Henry Stephens, and called him 'Louis Ott.'

"Stephen McIver, another nephew, of Pasadena, California, testified that his conversation was almost entirely confined to past events; that he reverted continually to his younger days in the woods. That while in the midst of a conversation he would dwindle off into a doze, and when he came to, would sometimes go off on some other topic not connected with the subject he was speaking about when he went into the doze. That in speaking to him you would have to repeat four or five times, in order to make him understand the drift of what you were saying. While you were talking, he would drift off into some other subject and become irritable over nothing. His conversation was rambling. He seldom carried to conclusion sentences he had begun. His mental and physical condition failed as time went on. It was impossible to discuss business matters with him. He did not seem to make an effort to comprehend what was said to him.

"That his chauffeur testified that early in 1916 he twice ordered the electric car to be delivered at the door; that he would obey the command, and it would stay there anywhere from half an hour to one hour, possibly more, and then Al Stephens would call up and want to know why the car was in the driveway; when he was told he had ordered it placed there, he would deny that he had done so. Upon other occasions, he would order this chauffeur, after driving him home in the afternoon from the office, to go back to the office and bring guests back to his residence whom he said were waiting there. He did this twice. The chauffeur would drive to the office and find no guests, and upon his return, Al Stephens would ask him where he had been, and when he would tell him, he would deny he had ever sent him after guests. Upon another occasion, while he was being driven, he shouted to the chauffeur, 'Look out, George, the men are trying to get me,' although the driver could see nobody who looked as though they were trying to get him. That upon this occasion, he was very nervous and excitable looking.

"That Professor Florer testified that he was egotistical and self-sufficient. That on one occasion in the spring of 1923, he failed to recognize Professor Florer, when he met him at the Detroit club, but called him 'Henry,' and spoke of how they had been together in their boyhood days in the lumber woods—although they had only known each other for a few years, and that it had taken the professor three or four minutes to make the said Al Stephens comprehend his mistake.

"Harvey Bowerman, of Romeo, testified that he had known Al Stephens ever since he was a boy. That in 1917 he came to his store, and did not know him, and asked him who he was, although he came to the store frequently.

"Charles McIver, his brother-in-law, who had known him since his boyhood, testified that in 1919,

when he called to see him at his office, he called him 'Dr. Harvey,' and asked him how the Romeo people were. Dr. Harvey was his first wife's father, and had been dead for many years. That in 1923 he failed to recognize this brother-in-law, when he met him at the hotel in San Francisco.

"That Donaldson Craig testified that about 1923, he met him coming down from Grayling on a Pullman train; that he told him that someone had burned up his buildings; he also told him that there were people on the train who wanted to kill him; he put his arms about Craig's shoulders, and was very excited and frightened. That he kept this up during the whole journey to Detroit, which lasted some seven or eight hours, and that the porter and said Craig could not pacify him, although they tried.

"If the facts I have narrated are true, would you say Albert Stephens had mental capacity upon October 11, 1923, to understand what property he had, his relation to others who might be the natural objects of his bounty, the scope and bearing of the provisions of his will, and sufficient active memory to assemble in his mind at that time, without prompting, the elements of the business to be transacted, and to hold them in his mind a sufficient length of time to perceive at least their obvious relation to each other, and to be able to offer some rational judgment in reference to them? Would you?"

Before answer there was included the following:

"*Q.* Do you think the fact that he may have sat on a bank board, or a trust company, would necessarily contradict the facts that I have stated?

"*A.* Out of my experience, I should say not necessarily so. * * * I mean that sitting on bank boards, in my experience, does not necessarily prove that an individual does not have organic disease of the brain. If I may answer in another way, I have

actually seen members of bank boards actually have organic disease of the brain, out of my own experience. * * *

"*Q.* Now, the court has suggested, and the counsel on the other side, that Joel Prescott, whom I called in here to identify the inventory, testified as follows: * * *

"Mr. Joel Prescott testified that Mr. Stephens was a member of the board of the Union Trust Company, and that he attended certain meetings, and he acted on certain committees, and that his actions seemed to be nothing out of the way, and that his pronouncements were accorded proper deference; and I think he sat on the boards right up to 1926.

"Now, with that amendment, and remembering the characteristics that I have described to you, if the facts I have narrated are true, would you say Albert Stephens had mental capacity upon October 11th, 1923, to understand what property he had, his relation to others who might be the natural objects of his bounty, the scope and bearing of the provisions of his will, and sufficient active memory to assemble in his mind at that time, without prompting, the elements of the business to be transacted, and to hold them in his mind a sufficient length of time to perceive at least their obvious relation to each other, and to be able to offer some rational judgment in reference to them?

"*A.* In the hypothetical question, as amended, there are marked inconsistencies, so far as the mental picture is concerned. The conclusion I reach concerning the majority of the hypothetical facts stated therein, is that this individual was not competent, and that he would therefore be unable to keep clearly and concisely in his mind the extent of his property and the call of his heirs on his bounty."

On cross-examination the expert testified:

"I arrived at my answer to the hypothetical question from the majority of the hypothetical facts

stated in the question. I did not arrive at that conclusion accepting as to all of the statements. Certainly the statements were inconsistent. One has to believe one or the other. I did not arrive at it accepting all of the statements as true.''

When the attention of the expert was challenged to undisputed facts not incorporated in the hypothetical question, he stated:

''I would say that that is such a highly inconsistent picture from a psychiatric standpoint that one could not reach an opinion of any accuracy at all. If these latter factors which you have just enumerated are true, then I should say that that was evidence of a competent individual.  *  *  *

''If you make a hypothetical question on those facts, then I should unhesitatingly give as an opinion that he was competent, from that set of facts, which are a very different set of facts.''

Contestants complain of the action of the court in requiring reference to be made in the hypothetical question to the testimony of Mr. Prescott. Mr. Prescott was called by contestants and was not an adverse party, and we cannot find reversible error in requiring the expert to consider testimony the jury would have had to consider, had the expert's opinion been submitted to the jury. In passing upon hypothetical questions, considerable discretion is vested in the trial judge, although, as a rule, counsel have a right to frame hypothetical questions, leaving consideration of counter facts to be presented upon cross-examination. Against the presumption of mental competency, supported by undisputed acts of testator establishing mental competency, the expert medical testimony, without consideration of such acts, had no probative force and presented no issue for the jury. Even the experts,

when asked to assume some of the undisputed actualities, frankly acknowledged the control thereof. The mental competency of Mr. Stephens at the time he executed the will was clearly established.

Mr. Stephens, at the time the will was executed, and for some time before and after, was a member of the boards of directors of the Union Trust Company of Detroit and the Wayne County and Home Savings Bank of the same city, and the day before the will was executed he attended a meeting of the mortgage loan committee of the Union Trust Company and participated in passing upon some 19 applications for loans of trust funds aggregating over $82,000, personally initialing most of them after each was presented to the committee and passed upon. This evidence as to his normal mental condition stands absolutely undisputed, except by claimed inferences from contestants' witnesses as to his conduct and speech at other times and places, mostly remote, together with expert medical testimony, based on hypothetical questions devoid of unquestioned controlling acts showing mental competency.

There was no issue for the jury, and the circuit judge was right in directing the allowance of the will.

The judgment is affirmed, with costs against contestants.

FEAD, C. J., and NORTH, FELLOWS, CLARK, McDONALD, POTTER, and SHARPE, JJ., concurred.